QUINN EMANUEL URQUHART & SULLIVAN, LLP

Robert P. Feldman (Bar Number 69602)
bobfeldman@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5069
Facsimile:    (650) 801-5100

John M. Potter (Bar Number 165843)
johnpotter@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

Michael T. Packard (*pro hac vice*)
michaelpackard@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone:    (617) 712-7118

Attorneys for Defendants Pangang Group Company, Ltd., Pangang Group Steel Vanadium & Titanium Company, Ltd., Pangang Group Titanium Industry Company, Ltd., and Pangang Group International Economic & Trading Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>PANGANG GROUP COMPANY, LTD.;<br>PANGANG GROUP STEEL VANADIUM &<br>TITANIUM COMPANY, LTD.; PANGANG<br>GROUP TITANIUM INDUSTRY<br>COMPANY, LTD; and PANGANG GROUP<br>INTERNATIONAL ECONOMIC &<br>TRADING COMPANY,<br><br>        Defendants. | CASE NO. 4:11-CR-0573-07-10 JSW<br><br>**PANGANG DEFENDANTS' REPLY<br>IN SUPPORT OF THEIR MOTION<br>TO DISMISS INDICTMENT**<br><br>Date:        January 4, 2022<br>Time:        9:30 a.m.<br>Judge:       Hon. Jeffrey S. White<br>Courtroom:   5, 2nd Floor |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.    DEFENDANTS ARE FOREIGN INSTRUMENTALITIES ENTITLED TO
      INVOKE SOVEREIGN IMMUNITY ..................................................................... 1

      A.    The Government Does Not Dispute That All Defendants Are "Organs" Of
            The PRC ......................................................................................................... 2

      B.    The Pangang Group Also Was Majority Owned By The PRC At The Time It
            Was Indicted ................................................................................................. 2

II.   THE GOVERNMENT IS UNABLE TO REBUT DEFENDANTS' SHOWING OF
      ABSOLUTE IMMUNITY FROM CRIMINAL PROSECUTION ........................... 4

      A.    Section 3231 Does Not Confer Criminal Jurisdiction Over Foreign States
            And Their Instrumentalities ........................................................................... 5

            1.    The Supreme Court Has Long Held That General Jurisdictional
                  Statutes, Like Section 3231, Do Not Extend To Foreign States ........... 5

            2.    There Have Never Been Any Contested Criminal Prosecutions Of
                  Foreign States Or Instrumentalities Before This One ........................... 9

      B.    The FSIA Separately Grants Foreign States And Their Instrumentalities
            Absolute Immunity From Criminal Prosecution ......................................... 11

      C.    The FSIA's Exceptions Do Not Apply ....................................................... 13

CONCLUSION .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ................................................................. 6, 12, 13

*Berizzi Bros. Co. v. Pesaro*,
   271 U.S. 562 (1926) ......................................................................... 5, 6

*Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*,
   137 S. Ct. 1312 (2017) ......................................................................... 12

*Broidy Cap. Mgmt. LLC v. State of Qatar*,
   982 F.3d 582 (9th Cir. 2020) ............................................................... 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2018 WL 659084 (N.D. Cal. Feb. 1, 2018) ............................................. 3

*Dale v. Colagiovanni*,
   337 F. Supp. 2d 825 (S.D. Miss. 2004) .................................................. 9

*E.E.O.C. v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991) ............................................................................... 7

*Ex parte Republic of Peru*,
   318 U.S. 578 (1943) ............................................................................... 8

*Faulks v. Wells Fargo & Co.*,
   231 F. Supp. 3d 387 (N.D. Cal. 2017) .................................................... 3

*Fed. Republic of Germany v. Philipp*,
   141 S. Ct. 703 (2021) ..................................................................... 12, 13

*Fox Television Stations, Inc. v. Aereokiller, LLC*,
   851 F.3d 1002 (9th Cir. 2017) ............................................................... 7

*Gould, Inc. v. Mitsui Min. & Smelting Co.*,
   750 F. Supp. 838 (N.D. Ohio 1990) ....................................................... 9

*In re Grand Jury Proceeding Related to M/V DELTUVA*,
   752 F. Supp. 2d 173 (D.P.R. 2010) ....................................................... 10

*In re Grand Jury Subpoena*,
   912 F.3d 623 (D.C. Cir. 2019) ..................................................... 6, 10, 12

*Guar. Tr. Co. of N.Y. v. United States*,
   304 U.S. 126 (1938) ............................................................................... 9

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) ............................................................................... 7

*In re Investigation of World Arrangements with Rel. to Prod., Transp., Ref. & Distrib. of Petroleum*,
   13 F.R.D. 280 (D.D.C. 1952) ........................................................... 8, 10

*Keller v. Cent. Bank of Nigeria,*
  277 F.3d 811 (6th Cir. 2002) .................................................................. 9

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013) .............................................................................. 7

*Law v. Siegel,*
  571 U.S. 415 (2014) .............................................................................. 6

*Lomax v. Ortiz-Marquez,*
  140 S. Ct. 1721 (2020) ........................................................................ 12

*Matar v. Dichter,*
  563 F.3d 9 (2d Cir. 2009) ...................................................................... 8

*Medellin v. Texas,*
  552 U.S. 491 (2008) .............................................................................. 8

*Ochoa v. Santa Clara Cty. Office of Educ.,*
  2017 WL 2423183 (N.D. Cal. June 5, 2017) ........................................ 3

*Pasquantino v. United States,*
  544 U.S. 349 (2005) .............................................................................. 8

*People v. McLeod,*
  1 Hill 377 (N.Y. Sup. Ct. 1841) ............................................................ 8

*Permanent Mission of India to the United Nations v. City of New York,*
  551 U.S. 193 (2007) ............................................................................ 13

*Peterson v. Islamic Republic Of Iran,*
  627 F.3d 1117 (9th Cir. 2010) ............................................................ 14

*Republic of Argentina v. NML Capital Ltd.,*
  573 U.S. 134 (2014) .............................................................. 10, 11, 13

*Republic of Iraq v. Beaty,*
  556 U.S. 848 (2009) .............................................................................. 8

*Republic of Mexico v. Hoffman,*
  324 U.S. 30 (1945) ................................................................................ 8

*RJR Nabisco, Inc. v. Eur. Cmty.,*
  579 U.S. 325 (2016) ........................................................................ 6, 14

*Schooner Exchange v. McFadden,*
  11 U.S. 116 (1812) ............................................................................ 5, 6

*Southway v. Cent. Bank of Nigeria,*
  198 F.3d 1210 (10th Cir. 1999) ............................................................ 9

*United States v. Aerlinte Eireann,*
  No. 89-CR-647, Dkt. No. 12 (S.D. Fla. Oct. 6, 1989) ........................ 10

*United States v. Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936) ............................................................................................ 8

*United States v. Hendron*,
    813 F. Supp. 973 (E.D.N.Y. 1993) ....................................................................... 9

*United States v. Ho*,
    2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016) ....................................................... 9

*United States v. Jasin*,
    1993 WL 259436 (E.D. Pa. July 7, 1993) ............................................................. 9

*United States v. Klein*,
    80 U.S. 128 (1871) ............................................................................................... 8

*United States v. Noriega*,
    117 F.3d 1206 (11th Cir. 1997) ............................................................................ 9

*United States v. Pangang Grp. Co., Ltd.*,
    6 F.4th 946 (9th Cir. 2021) ......................................................................... 2, 4, 11

*United States v. Statoil, ASA*,
    No. 06-CR-960, Dkt. No. 5 (S.D.N.Y. Oct. 13, 2006) ........................................ 10

*United States v. Turkiye Halk Bankasi A.S.*,
    16 F.4th 336 (2d Cir. 2021) .................................................................................. 7

*Verlinden, B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983) .............................................................................................. 7

*Victory Transp. Inc. v. Comisaria Gen.*,
    336 F.2d 354 (2d Cir. 1964) ................................................................................. 8

*Yousuf v. Samantar*,
    699 F.3d 763 (4th Cir. 2012) ................................................................................ 9

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) ............................................................................................. 7, 8

**Statutory Authorities**

18 U.S.C. § 1831 ................................................................................................... 10

18 U.S.C. § 3231 .............................................................................. 1, 4, 6, 7, 10, 11

28 U.S.C. § 1330(a) .............................................................................................. 11

28 U.S.C. § 1350 .................................................................................................... 6

28 U.S.C. § 1391(f) ............................................................................................... 11

28 U.S.C. § 1441(d) .............................................................................................. 11

28 U.S.C. § 1605 ................................................................................................... 14

28 U.S.C. § 1605A .................................................................................................. 11, 14

28 U.S.C. § 1605B .................................................................................................. 11, 14

28 U.S.C. § 1608 .......................................................................................................... 11

**Additional Authorities**

An Act to Establish the Judicial Courts of the United States
§ 9, 1 Stat. 73, 76 (1789) ("Judiciary Act of 1789") ............................................. 5

Hazel Fox & Philippa Webb, *The Law of State Immunity* (3d ed. 2015) ................................... 7, 10

Lining Shan, *China Launches Nationwide Company Credit Information System*,
Nov. 4, 2014, *available at* https://tinyurl.com/yc2frbj8 ............................................. 3

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

The Government has ignored both the "changed landscape" created by the Ninth Circuit's opinion in this case and the central, controlling points in Defendants' Motion ("Mot."). The Government says not one word about Defendants' status as "organs" of the People's Republic of China ("PRC"), thus conceding that they are foreign instrumentalities entitled to invoke sovereign immunity. Next, the Government agrees that the Foreign Sovereign Immunity Act ("FSIA") is focused in the main on civil cases, not criminal cases. These two points highlight the importance of the Government's error in its only argument regarding common law immunity: contrary to the Government's incorrect characterization of common law immunity as merely "prudential" or "policy," it is based on centuries of precedent. These precedents establish that general jurisdictional statutes (such Section 3231) do not apply to foreign sovereigns. No amount of rhetoric masks these basic truths. It is up to Congress to decide whether to authorize criminal prosecutions against foreign sovereigns, and to craft a scheme providing necessary protections against runaway prosecutions.

### ARGUMENT

## I. DEFENDANTS ARE FOREIGN INSTRUMENTALITIES ENTITLED TO INVOKE SOVEREIGN IMMUNITY

The Government's argument that Defendants do not qualify as foreign instrumentalities under the FSIA (Opp. 8-11) fails for two reasons. *First*, the Government does not address, much less dispute, that Defendants qualify as "organs" of the PRC. This failure to respond ends the inquiry into whether Defendants have made the required *prima facie* showing based on the state's ownership and alleged control of all four entities' operations. (*See* Mot. 8-12.) The Court need go no further on this threshold issue. But if it does so, then, *second*, one Defendant—Pangang Group—qualifies for FSIA immunity because an official Chinese government website shows that it was a state-owned enterprise at the time the Government initiated this prosecution. (*See* Mot. 7-8.) The Government's meritless arguments to the contrary are not based on any counterevidence.

**A.      The Government Does Not Dispute That All Defendants Are "Organs" Of The PRC**

In their Motion, Defendants showed that they are each entitled to immunity under the FSIA and at common law because each qualifies as an "organ" of the PRC given the alleged state ownership and control of their operations.  (*See* Mot. 8-12.)  The Government offers neither argument nor evidence in response; to be clear, the Government's Opposition does not even mention this issue.  This concession is no surprise considering the Government's own indictments and expert declaration allege that Defendants are owned and controlled by the PRC and work to advance its interests, which establishes a *prima facie* case for "organ" status and thus immunity under the FSIA and common law.  (*See* Mot. 9-12.)[1]

**B.      The Pangang Group Also Was Majority Owned By The PRC At The Time It Was Indicted**

If the Court deems it appropriate to go further, it should rule that one of the Defendants—Pangang Group—qualifies as a foreign instrumentality for the independent reason that it was majority-owned by the PRC in February 2012, when it was first charged.  (*See* Dkt. No. 64 (Superseding Indictment).)  It was not until January 12, 2014, that Pangang Group's shares were transferred from SASAC to the Anshan Iron and Steel Group ("Angang").  This fact is demonstrated by Exhibit C to the Declaration of Zi Chun Wang (Dkt. No. 1295-2), a screenshot from China's National Enterprise Credit Information Publicity System ("NECIPS") showing the date on which this equity change occurred.  (*See* Mot. 7-8.)  None of the Government's responses has any merit.

---

[1]   The Government seems to argue (Opp. 23 n.6) that Defendants waived this argument because they did not argue organ status "in 2019," ignoring that the Government then conceded they were foreign instrumentalities.  *See* Dkt. 1201 at 5 ("As an instrumentality of the PRC, the Pangang Defendants argue ....").  At the hearing, the Court asked the Government whether it objected to Defendants' argument that they qualified as foreign instrumentalities, and the Government responded, "No."  Aug. 13, 2019 Tr. at 4:18-24; *see also id.* at 45:4-7 (conceding there were no "significant" differences between the Economic Espionage Act's and FSIA's definition of "instrumentality").  The Government only reversed course at oral argument in the Ninth Circuit.  In any event, foreign sovereign immunity is jurisdictional, so Defendants could not have waived arguments in support of their immunity defense.  *See, e.g.*, *United States v. Pangang Grp. Co., Ltd.*, 6 F.4th 946, 959 (9th Cir. 2021) ("Because the issue goes to subject matter jurisdiction, we are not bound by the Government's failure to object below to the Pangang Companies' argument ....").

At the outset, the Government wrongly claims (Opp. 9) that the NECIPS screenshots cannot constitute cognizable evidence because they have not been "certified as foreign public or private document[s] to establish authenticity under [FRE] 902(3) or (12), or to establish a hearsay exception under [FRE] 803(6) (business records) or 803(8) (public records)." The Government fails to cite a single case holding that such certifications are required when a court conducts the FSIA's *prima face* analysis. Indeed, the law is to the contrary: FSIA immunity claims must generally be supported by "evidence evaluated under the same evidentiary standard that governs in the summary judgment context," *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2018 WL 659084, at *4 (N.D. Cal. Feb. 1, 2018) (internal citation omitted), and courts assessing summary judgment motions "may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony[,] business records," or other methods, *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387, 397 (N.D. Cal. 2017) (internal citations omitted). Here, information pulled from NECIPS could be certified in accordance with the Federal Rules of Evidence in advance of trial, *or* a live witness from Pangang Group or Angang could testify about those facts. Accordingly, the NECIPS screenshots are properly before the Court. *See id.* at 398 (overruling objection to consideration of inadmissible hearsay on summary judgment "because it is possible that the facts underlying [the exhibit] could be admissible at trial"); *Ochoa v. Santa Clara Cty. Office of Educ.*, 2017 WL 2423183, at *5 (N.D. Cal. June 5, 2017) ("[C]ourts at the summary judgment stage focus not on the form of the evidence submitted by the parties but on the admissibility of its contents.").

The Government asserts (Opp. 9-10) that Defendants should have provided "cap tables or [internal] records regarding [these] ownership transactions," rather than NECIPS records, but it again provides no authority for its attempt to dictate the form of proof presented to this Court. Moreover, the reliability of the NECIPS, a state-sponsored website, is confirmed by the Chinese courts themselves, which have held "registration information obtained from th[is online] system may be used to establish the status of a corporate entity for the purposes of filing a lawsuit …, and may be used as evidence." Lining Shan, *China Launches Nationwide Company Credit Information System*, Nov. 4, 2014, *available at* https://tinyurl.com/yc2frbj8 (last visited Dec. 21, 2021).

1      Tellingly, the Government fails to present *any* evidence to rebut the substance of the NECIPS

2   screenshots.  Instead, it attacks the Defendants' integrity, asserting without proof (Opp. 10) that the

3   NECIPS websites "appear to [have been] ginned up by the Defendants … specifically for the

4   purpose of attempting to support this motion."  But the Government's attack is baseless, for two

5   reasons:  (1) it relies on the face of the NECIPS screenshots, which plainly state exactly when the

6   report to the NECIPS website was made, meaning this supposed effort to manufacture evidence was

7   done in plain sight; and (2) the challenged evidence applies to just one of the four Defendants,

8   making the "ginned up" evidence rather modest, at best.  In short, the NECIPS screenshots establish

9   the PRC's ownership of Pangang Group at the time of indictment, and the Government has offered

10  nothing in rebuttal.

11     The Government's final argument is based on a basic misunderstanding of the law.  The

12  Government asserts (Opp. 10-11) that even if the Court accepts Defendants' evidence, Pangang

13  Group still fails to qualify as a state-owned enterprise because the Third Superseding Indictment

14  was filed in January 2016, *after* Angang acquired its shares from SASAC, meaning it was not

15  "owned by a foreign state *at the time the suit [was] filed*."  (Emphasis in original.)  The Ninth Circuit

16  specifically held in this very case that "a defendant's status as an 'agency or instrumentality of a

17  foreign state' must be determined as of the time it was *first indicted*"; here, that is "February 7,

18  2012."  *Pangang*, 6 F.4th at 957 (emphasis added).  The evidence submitted in support of the

19  Motion—which stands unrebutted—establishes a *prima facie* case that Pangang Group was

20  majority-owned by SASAC as of that date.  The Government's argument contrary to binding law

21  should be disregarded.

22  **II.    THE GOVERNMENT IS UNABLE TO REBUT DEFENDANTS' SHOWING OF**

23  **ABSOLUTE IMMUNITY FROM CRIMINAL PROSECUTION**

24     On the dispositive issue of absolute immunity, the Government's opposition seeks (Opp. 11)

25  to answer the wrong question:  whether the FSIA "strip[s] district courts of jurisdiction over criminal

26  cases."  In fact, when the FSIA was enacted, district courts lacked such jurisdiction because neither

27  Section 3231 nor any other statute extended criminal jurisdiction to prosecutions of foreign states

28  and instrumentalities.  That remains unchanged today.  The Government all but concedes that this

1    is the first ever criminal prosecution of a foreign instrumentality asserting a sovereign immunity

2    defense.  It can thus prevail only if this Court accepts that courts always had criminal jurisdiction

3    over foreign states but—remarkably—the Government chose to invoke it for the first time here.  To

4    do so would ignore controlling Supreme Court precedent, disregard the FSIA's plain text, and

5    greenlight county-level prosecutors around the country to charge foreign states as they see fit.  It

6    should be up to Congress, not federal prosecutors, to decide whether (and how) to depart from this

7    longstanding history.

8         **A.     Section 3231 Does Not Confer Criminal Jurisdiction Over Foreign States And**

9              **Their Instrumentalities**

10        The Government has continually maintained in this case (*e.g.*, Opp. 12-19; Dkt. 1201 at 2-

11   7) that the FSIA does not apply in criminal cases and thus has had to concede that foreign

12   instrumentalities retain the "common law" immunity in criminal cases that "still exists outside the

13   FSIA." (Mot. 5 n.2 (quoting CA9 Oral Arg.).)  But the Government gets the common law wrong in

14   the two meager paragraphs (Opp. 23-24) in which it addresses the issue.  In short, foreign states

15   always have been immune from criminal jurisdiction in U.S. courts.  This is not a "policy" or

16   "prudential" argument—as the Government asserts without authority (Opp. 1, 22)—but a

17   jurisdictional defect, backed up by two centuries of law that the Government barely addresses.

18        **1.     The Supreme Court Has Long Held That General Jurisdictional**

19              **Statutes, Like Section 3231, Do Not Extend To Foreign States**

20        The Government ignores that the Supreme Court—since the time of Chief Justice

21   Marshall—has held that "general statutory provisions [] which are descriptive of the ordinary

22   jurisdiction of the judicial tribunals" should not be "construed as to give them jurisdiction" over

23   foreign states. *Schooner Exchange v. McFadden*, 11 U.S. 116, 146 (1812); *see, e.g.*, *Berizzi Bros.*

24   *Co. v. Pesaro*, 271 U.S. 562, 573, 576 (1926) (reaffirming this holding).  For that reason, in *Schooner*

25   *Exchange*, the Court interpreted a statute granting jurisdiction over "*all* civil causes of admiralty"

26   as not extending to actions against foreign public ships.  *See* 11 U.S. at 121, 145-47 (emphasis

27   added); *see also* An Act to Establish the Judicial Courts of the United States § 9, 1 Stat. 73, 77

28   (1789) ("Judiciary Act of 1789").  More recently, in *Argentine Republic v. Amerada Hess Shipping*

*Corp.*, 488 U.S. 428 (1989), the Supreme Court held that the Alien Tort Statute's ("ATS") grant of jurisdiction over "*any* civil action by an alien for a tort ... in violation of the law of nations," 28 U.S.C. § 1350 (emphasis added), did not extend to foreign states.  *See* 488 U.S. at 436.

These cases sink the Government's jurisdictional ship.  The logic of these decisions dictates that 18 U.S.C. § 3231's general grant of jurisdiction over "all offenses against the laws of the United States" does not confer federal criminal jurisdiction over foreign states either.  (*See* Mot. 12-16.) Indeed, Section 3231 was originally enacted as part of Section 9 of the Judiciary Act of 1789, the very same provision containing the admiralty grant at issue in *The Schooner Exchange* and the ATS at issue in *Amerada Hess*.[2]  It would make no sense to interpret a section granting jurisdiction over "*all* offenses" to confer jurisdiction over foreign states when the phrases "*all* civil causes" and "*all* causes" did not.  *See, e.g.*, *Law v. Siegel*, 571 U.S. 415, 422 (2014) ("words repeated in different parts of the same statute generally have the same meaning").  The Government emphasizes (Opp. 14 n.2) that Section 3231 uses the word *all*, but the fact that *all* "ordinarily connotes breadth" is not a clear enough signal that Congress intended to authorize criminal prosecutions that offend "foreign sovereigns' dignity," *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 349-50 (2016) (the word *any* "is insufficient to displace the presumption against extraterritoriality"); *cf. Schooner Exchange*, 11 U.S. at 137 (explaining that the United States has waived its "territorial jurisdiction" over foreign sovereigns).[3]

---

[2]  Section 9 reads, in part: "the district courts shall have ... cognizance of *all crimes and offences* that shall be cognizable under the authority of the United States ...; and shall also have exclusive original cognizance of *all civil causes of admiralty* and maritime jurisdiction .... And shall also have cognizance ... of *all causes* where an alien sues for a tort only in violation of the law of nations or a treaty of the United States …"  Judiciary Act of 1789 (emphases added).

[3]  The Government relies extensively on *In re Grand Jury Subpoena*, 912 F.3d 623 (D.C. Cir. 2019) (per curiam) (Opp. 12, 17), but that case misinterpreted the Supreme Court decisions discussed in text.  *In re Grand Jury Subpoena* stated that federal courts had statutory jurisdiction over foreign states before the FSIA was enacted.  *See id.* at 631.  This is incorrect.  *See, e.g.*, *Berizzi Bros.*, 271 U.S. at 576 ("[T]he general words of section 24, cl. 3, of the Judicial Code (Comp. St. s 991), investing the District Courts with jurisdiction of 'all civil causes of admiralty and maritime jurisdiction,' must be construed, in keeping with the last paragraph before quoted from *The Exchange*, as not intended to include a libel in rem against a public ship, such as the Pesaro, of a friendly foreign government.").

1    The Government briefly asserts (Opp. 23) that pre-FSIA common law immunity (which

2    tracked international law, *see* Dkt. No. 1295-3 ("Tate Letter") at 985) "had an exception for a foreign

3    state's commercial activity," but fails to respond to Defendants' authority showing that this was true

4    only "for *civil actions*," leaving "untouched" the rule of absolute immunity "in criminal

5    proceedings." (Mot. 14 (quoting Hazel Fox & Philippa Webb, *The Law of State Immunity* at 91 (3d

6    ed. 2015)).) Indeed, the cases upon which the Government relies address the restrictive theory of

7    sovereign immunity, *see Verlinden, B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487-88 (1983);

8    *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 n.70 (2d Cir. 2021), which has never

9    been applied to criminal proceedings, *see* Mot. 14 (explaining restrictive theory's application to civil

10   actions). The Second Circuit overlooked this distinction in *Turkiye Halk Bankasi. See* 16 F.4th at

11   351 n.70.

12   Critically, the Government does not dispute that interpreting Section 3231 to grant criminal

13   jurisdiction over foreign states and instrumentalities would violate international law. (*See* Mot. 13-

14   14, 22.) This uncontested argument is dispositive on its own. Statutes must be construed not to

15   violate international law "if any other possible construction" exists, *Fox Television Stations, Inc. v.*

16   *Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017) (internal citations omitted), and Defendants'

17   interpretation of Section 3231 is, to say the least, "possible." This rule of construction "helps ensure

18   that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy

19   consequences not clearly intended by the political branches," *Kiobel v. Royal Dutch Petroleum Co.*,

20   569 U.S. 108, 116 (2013). Such presumptions in international law also apply to the Executive

21   Branch, *see, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 611-12 (2006) (plurality) (customary

22   international law limited military commission's "jurisdiction"); *E.E.O.C. v. Arabian Am. Oil Co.*,

23   499 U.S. 244, 258 (1991), because "whether the realm is foreign or domestic, it is still the Legislative

24   Branch, not the Executive Branch, that makes the law," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576

25   U.S. 1, 21 (2015).

26   Accordingly, the Government is mistaken (Opp. 23) that foreign sovereign immunity was

27   historically a "prerogative of the Executive Branch." To recap, no statute or constitutional provision

28   gives the Executive this power, and Article III bars the President from dictating the result in a

specific case.  *See United States v. Klein*, 80 U.S. 128, 146-47 (1871).  Historically, too, courts did

not defer to Executive immunity positions in criminal cases because "the trial of crimes [is]

exclusively in the hands of the judiciary" and cannot "be confided to the executive power."  *People*

*v. McLeod*, 1 Hill 377, 433 (N.Y. Sup. Ct. 1841) (rejecting Secretary of State's immunity suggestion

for British insurgent); *In re Investigation of World Arrangements with Rel. to Prod., Transp., Ref.*

*& Distrib. of Petroleum*, 13 F.R.D. 280, 290-91 (D.D.C. 1952) (quashing federal criminal

subpoena).  The State Department itself acknowledged in 1952 that its views on sovereign immunity

"cannot control the courts," Tate Letter at 985, and in 1973 that courts can "determine the question"

of immunity themselves regardless of the government's wishes, Dkt. No. 1295-3 at 34.[4]

The Government's arguments to the contrary turn solely on passing dicta, *see Republic of*

*Iraq v. Beaty*, 556 U.S. 848, 857 (2009) (Opp. 15); inapposite cases, *see Pasquantino v. United*

*States*, 544 U.S. 349, 372 (2005) (Opp. 16, 24) (government could prosecute wire fraud, even though

the fraud also violated foreign law); *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (Opp. 24)

(director of the Israeli Security Agency could not be sued for bombing Hamas); and a long-debunked

claim that the Executive is "the sole organ of the federal government in the field of international

relations," *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (Opp. 24).  It

has never been "for the President alone"—let alone federal prosecutors—"to determine the whole

content of the Nation's foreign policy."  *Zivotofsky*, 576 U.S. at 21 (criticizing citations to this

*Curtiss-Wright* passage).

---

[4]   *Ex parte Republic of Peru*, 318 U.S. 578 (1943) (Opp. 23), suggested that courts should
dismiss suits against foreign public ships when the government chooses to resolve the underlying
dispute "through diplomatic negotiations," *id.* at 588, not that the Executive can veto immunity.
This statement, moreover, refers to the "narrow" authority of a President to make "executive
agreements to settle civil claims between American citizens and foreign governments or foreign
nationals."  *Medellin v. Texas*, 552 U.S. 491, 531 (2008) (refusing to "stretch" this "narrow and
"strictly limited authority" to "unprecedented" new uses, *id.* at 532).  The Government also cites
*Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945) (Opp. 15), ignoring that only two Justices
advocated absolute deference to the Executive's immunity suggestions there (*see* Mot. 16-17 n.12).
*See also Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354,
358 (2d Cir. 1964) (explaining pro-deference language in *Hoffman* was "dictum," and rejecting the
notion that "courts will never grant immunity unless the State Department specifically requests it").

**2.      There Have Never Been Any Contested Criminal Prosecutions Of Foreign States Or Instrumentalities Before This One**

The Government asserts (Opp. 6) that "no court has ever applied [sovereign immunity] to bar a federal criminal prosecution," disregarding that this case appears to be the *first* prosecution of a foreign instrumentality that has asserted sovereign immunity (*see* Mot. 15).  Until now, criminal jurisdiction over foreign instrumentalities came up only when private individuals brought civil RICO claims based on foreign instrumentalities' purported criminal activities, or in rare cases when federal grand juries subpoenaed foreign state-owned companies.  Three of the four courts hearing RICO suits dismissed them because "this country does not bring criminal proceedings against other nations."  *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 750 F. Supp. 838, 844 (N.D. Ohio 1990).[5] Leading treatises agreed.  (*See* Mot. 19.)  Courts would even quash criminal *subpoenas* issued to foreign instrumentalities on foreign sovereign immunity grounds.  *See Investigation of World Arrangements*, 13 F.R.D. at 290-91.

The Government does not directly address any of this, and its cited authorities only underscore just how unprecedented this case is.  It mentions (Opp. 16-19) prosecutions of *individuals* working for foreign states and instrumentalities, but not the states or instrumentalities themselves.[6]  These cases are inapposite, as individuals can attempt to invoke only foreign *official* immunity, not foreign sovereign immunity.  *See, e.g.*, *Yousuf v. Samantar*, 699 F.3d 763, 768 (4th Cir. 2012).  Moreover, the defendants in three of the four cases did not even argue that they were entitled to foreign sovereign immunity.[7]  The Government also mentions two cases where foreign

---

[5]  *See Keller v. Cent. Bank of Nigeria*, 277 F.3d 811 (6th Cir. 2002), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Dale v. Colagiovanni*, 337 F. Supp. 2d 825, 842 (S.D. Miss. 2004).  *But see Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1214-16 (10th Cir. 1999).

[6]  *See United States v. Noriega*, 117 F.3d 1206 (11th Cir. 1997); *United States v. Ho*, 2016 WL 5875005 (E.D. Tenn. Oct. 7, 2016); *United States v. Hendron*, 813 F. Supp. 973 (E.D.N.Y. 1993); *United States v. Jasin*, 1993 WL 259436 (E.D. Pa. July 7, 1993).

[7]  *Noriega*, 117 F.3d 1206, denied head-of-state immunity to a person who "never served as the constitutional leader of Panama."  *Id.* at 1212.  This is entirely consistent with Defendants' argument (Mot. 16): The Executive has the "conclusive" power to "recogniz[e] a foreign government," but courts "are free to draw for themselves [the] legal consequences [of recognition]."  *Guar. Tr. Co. of*

instrumentalities chose not to contest criminal charges and thus did *not* assert foreign sovereign immunity.[8]  Finally, it cites two very recent cases rejecting a sovereign immunity defense in a motion to quash a criminal subpoena.[9]  But there is a world of difference between holding that foreign states lack "immunity from *discovery*," *Republic of Argentina v. NML Capital Ltd.*, 573 U.S. 134, 143-44 (2014) (emphasis in original) (holding that there is no such immunity), and subjecting them to criminal prosecution in violation of "international law's requirements of equality and non-intervention," *Fox & Webb, supra*, at 91.  None of these cases shows that the Government has ever had a "traditional role in deciding whether to prosecute ... a foreign-government-owned business." (Opp. 18.)

The dearth of prior criminal prosecutions of foreign instrumentalities also belies the Government's policy arguments.  The Government complains (*id.*) that, without criminal prosecution, it can respond to economic espionage only with "diplomatic pressure," ignoring all the other tools.  Again, the Government is not "powerless to stop" economic espionage (*id.*):  it prosecutes individual spies, expels diplomats, imposes sanctions, and (when it deems appropriate) brings civil actions (as may an alleged "victim," although the alleged victim in this case chose not to sue any of the Defendants).  The Economic Espionage Act ("EEA") keeps with this pattern, as it targets individuals who spy to "benefit any foreign government," 18 U.S.C. § 1831; indeed, the Government used the EEA to prosecute several individuals in this very case.  But until now, the EEA has never been used to prosecute a foreign state or instrumentality.

While no one denies that espionage—economic or otherwise—is serious, the Government's rhetoric overstates the importance of its charges in this case.  Today, more than a decade after the

---

*N.Y. v. United States*, 304 U.S. 126, 138 (1938).  The defendants in *Jasin* and *Ho* never raised any immunity argument at all (foreign official or foreign sovereign).  *Hendron* is the only case arguably supporting the government, but it never questioned that Section 3231 granted jurisdiction over foreign officials.  (*See* Mot. 19 n.16.)

[8]  *See United States v. Statoil, ASA*, No. 06-CR-960, Dkt. No. 5 (S.D.N.Y. Oct. 13, 2006) (*nolle prosequi* referencing deferred prosecution agreement); *United States v. Aerlinte Eireann*, No. 89-CR-647, Dkt. No. 12 (S.D. Fla. Oct. 6, 1989) (guilty plea).

[9]  *See In re Grand Jury Subpoena*, 912 F.3d 623; *In re Grand Jury Proceeding Related to M/V DELTUVA*, 752 F. Supp. 2d 173 (D.P.R. 2010).

alleged conspiracy, there is no chloride route $TiO_2$ plant built by Defendants.  And, as the Government has repeatedly maintained, this case involves conspiracy and attempt charges only—the Government has not charged the misappropriation of a single trade secret.  This is thus hardly the case in which to break unprecedented ground by prosecuting alleged foreign instrumentalities.

### 3.    Defendants Did Not Waive Common Law Immunity

The Government mistakenly asserts (Opp. 23 n.6) that Defendants waived their common law argument by not raising it in their prior motion.  In fact, Defendants raised this argument in their original motion to dismiss.  (*See* Dkt. 1205 at 6 ("[E]ven if the FSIA did not apply, Defendants would still be immune under federal common law."); Dkt. 1193 at 3.)  The Government did not respond then, and the Court did not reach the issue.  Defendants also argued on appeal that Section 3231 never extended to foreign instrumentalities at common law, *see* Appellants' Br. 26-27; Reply Br. 14-15, 25-26, but the Ninth Circuit did not reach it either.  And, in any event, no waiver is possible here because this argument implicates subject-matter jurisdiction.  *See Pangang*, 6 F.4th at 959.  Defendants' common law argument is thus ripe for decision.

### B.    The FSIA Separately Grants Foreign States And Their Instrumentalities Absolute Immunity From Criminal Prosecution

The preceding arguments establish Defendants' immunity, but if the Court additionally considers the FSIA, Defendants agree with the Government (Opp. 12) that the FSIA's procedures are "exclusively civil in focus."  The FSIA is "comprehensive" in creating special procedures for suing foreign states, but it creates no procedures—zero, none—for criminally prosecuting them. *NML*, 573 U.S. at 141 (internal citations omitted).  Section 1330(a) gives federal courts jurisdiction only over "civil action[s]" against foreign states; Section 1391(f) specifies venue only for "civil action[s]"; Section 1441(d) allows for removal to federal court only of "civil action[s]"; and Section 1608 creates special rules for service only of the "summons and complaint" but not indictments. The FSIA's exceptions to immunity, moreover, are designed for civil cases.  Sections 1605A and 1605B exclusively allow for money damages for actions based on "torture, extrajudicial killing, aircraft sabotage, [and] hostage taking," but not criminal prosecution.  (*See* Mot. 21.)  Even the commercial activities exception is limited to "actions," which generally refers to "civil actions."

(*See* Mot. 22.)  The FSIA's procedures were not built for and should not govern criminal cases.  And it follows that foreign states are absolutely immune, not (as the Government contends) that they lack any immunity under criminal law.  This is so for four reasons.

*First*, this is what the FSIA's plain text says.  Section 1604 states:  "[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  This "express provision," the Supreme Court has held, "preclude[s]" plaintiffs from suing foreign states under the ATS or any "other grants of subject-matter jurisdiction."  *Amerada Hess*, 488 U.S. at 437-38; *see id.* at 434 ("the FSIA [is] the sole basis for obtaining jurisdiction over a foreign state").[10]  Congress knew "how to limit [FSIA] provision[s] to a 'civil action' when it want[ed] to," *Grand Jury Subpoena*, 912 F.3d at 632, but this immunity provision is the one part of the FSIA that is *not* limited to civil jurisdiction.  This Court should not read such a limitation into Section 1604, as courts "may not narrow a provision's reach by inserting words Congress chose to omit."  *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).  The Government does not respond to this argument, and offers no interpretation of Section 1604.

*Second*, reading the FSIA to grant absolute immunity also aligns with the statute's "legal and historical backdrop," *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 712 (2021).  Courts have long interpreted general jurisdictional statutes like Section 3231 not to grant jurisdiction over foreign states and instrumentalities.  The FSIA thus did not "strip[] district courts of jurisdiction," as the Government wrongly asserts (Opp. 17), but left in place a longstanding bar.  *See, e.g.*, *Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017) (reading the FSIA in light of "basic principles of international law").  *Amerada Hess* made this very same point:  reading the FSIA as barring jurisdiction under other statutes does not violate the canon against implied repeal of statutes because there is a "lack of certainty as to whether" any of those

---

[10]   In *Halk Bankasi*, the Second Circuit acknowledged this holding, but stated that "*Amerada Hess* was a civil case and neither our Court nor the Supreme Court has ever extended this holding to a criminal case."  16 F.4th at 347 n.42.  There is no principled reason to limit *Amerada Hess*'s holding to civil cases.  The D.C. Circuit expressed concern about "gutting the government's crime-fighting toolkit," 912 F.3d at 630, but this rings hollow because the Government has never previously brought such prosecutions.

1   statutes "conferred jurisdiction" over foreign states in the first place. 488 U.S. at 436.  At minimum,

2   there were zero criminal prosecutions of foreign states or instrumentalities before the FSIA's

3   enactment; all the Government's examples are post-FSIA.  That is why the FSIA's legislative history

4   does not mention "federal criminal proceedings"—there were none to "displac[e]" (Opp. 16).

5       *Third*, reading the FSIA to grant absolute criminal immunity furthers "two well-recognized

6   and related purposes of the FSIA:  adoption of the restrictive view of sovereign immunity and

7   codification of international law at the time of the FSIA's enactment." *Permanent Mission of India*

8   *to the United Nations v. City of New York*, 551 U.S. 193, 199 (2007).  The Supreme Court has

9   repeatedly relied on this "express goal" when interpreting the FSIA.  *Philipp*, 141 S. Ct. at 713

10  (using this "express goal" to reject jurisdiction over Holocaust-era claims).  Again, the Government

11  has never contested that the restrictive theory and international law at the FSIA's enactment barred

12  criminal prosecution of foreign states and instrumentalities.

13      The Government wrongly argues (Opp. 16) that Congress had no desire to limit the federal

14  government's freedom of action against foreign states.  On the contrary, there is no reasonable way

15  to argue that the FSIA's requirements do not limit the *civil* cases any party—including the

16  Government—may bring.  Nothing suggests that Congress intended to give the Government free

17  reign to pursue any type of criminal prosecutions of foreign states in violation of international law,

18  while limiting its ability to bring only certain types civil suits.  The FSIA was also designed in part

19  to ensure that courts would not defer to the Executive's views on foreign sovereign immunity.  *See,*

20  *e.g.*, *NML*, 573 U.S. at 141 (characterizing pre-FSIA Executive views on the subject as "bedlam").

21      *Finally*, the Government does not dispute that interpreting the FSIA not to apply to criminal

22  cases would leave local prosecutors nationwide free to bring charges against foreign states, a

23  situation made all the more unacceptable because there would be no was for foreign states to remove

24  those prosecutions to federal court.  (*See* Mot. 21-22.)  It is implausible to think that Congress

25  intended such a result.  The Government's silence on this is telling.

26      **C.      The FSIA's Exceptions Do Not Apply**

27      The Government does not respond to any of Defendants' several arguments as to why the

28  FSIA's exceptions are inapplicable in criminal cases (*see* Mot. 20-23).  It states (Opp. 19) only that

1    Section 1605(a) "indicates that all of its exceptions apply 'in any case.'"  But courts often limit the

2    word "any" to avoid offending "foreign sovereigns[]."  *RJR Nabisco*, 579 U.S. at 349-50.  The

3    Government also does not deny that virtually all the FSIA exceptions are expressly limited to civil

4    actions for "torts," "admiralty," and "money damages."  28 U.S.C. §§ 1605, 1605A, 1605B.  This

5    produces an absurd result:  under the Government's view, the Government could prosecute

6    commercial irregularities, but not torture, extrajudicial killing, or aircraft sabotage.  The

7    Government does not respond.  Finally, applying the FSIA exceptions in criminal cases would be

8    dangerous because, again, it opens the door for thousands of local prosecutors to criminally

9    prosecute foreign states.  This undeniably threatens the political branches' control of foreign policy,

10   yet the Government offers no solution.  That could not have been Congress's intent.

11        In any event, the Government does not show that its indictment falls within any FSIA

12   exception.  It argues (Opp. 20) that Defendants' alleged "conduct falls within the first clause of the

13   commercial activity exception" for actions "based upon a commercial activity carried on in the

14   United States by the foreign states," 28 U.S.C. § 1605(a)(2).[11]  Yet the Government has no response

15   to Defendants' argument that the commercial activity exception applies only to "action[s]," 28

16   U.S.C. § 1605(a)(2), and "actions" refer to civil proceedings, not criminal ones.  Even if the

17   commercial activities exception could apply in some criminal cases, it does not here.  (*See* Dkt. No.

18   1205 at 7-9.)  *See also Broidy Cap. Mgmt. LLC v. State of Qatar*, 982 F.3d 582, 594 (9th Cir. 2020)

19   (foreign state that hires people to steal trade secrets cannot be sued under the commercial activities

20   exception because "espionage," not incidental contracts in furtherance of espionage, is the "basis

21   for [the] suit") (internal citations omitted), *cert. denied*, 141 S. Ct. 2704 (2021).

22        Finally, the waiver exception does not apply because Defendants raised their foreign

23   sovereign immunity defense at the first available opportunity.  (*See* Dkt. No. 1205 at 9.)

24

25

---

26        [11]  There are three clauses in the commercial activities exception.  *See* 28 U.S.C. § 1605(a)(2).
     The Government does not argue that the second or third clauses apply here.  Because a party bringing
27   an action against a foreign state has the burden of showing a FSIA exception applies, *see, e.g.*,
     *Peterson v. Islamic Republic Of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010), the Government has
28   abandoned those other clauses.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For all the foregoing reasons, and those stated in Defendants' opening brief, the Indictment should be dismissed.

Dated:  December 21, 2021

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ Robert P. Feldman*
Robert P. Feldman
John Mark Potter
Michael T. Packard

*Attorneys for Pangang Defendants*