UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PANGANG GROUP COMPANY, LTD.,<br>PANGANG GROUP STEEL VANADIUM<br>& TITANIUM COMPANY, LTD.;<br>PANGANG GROUP TITANIUM<br>INDUSTRY, LTD; and PANGANG<br>GROUP INTERNATIONAL ECONOMIC<br>& TRADING COMPANY,<br><br>Defendants. | Case No.  11-cr-00573-JSW-7-10<br><br>**ORDER DENYING SECOND MOTION<br>TO DISMISS THIRD SUPERSEDING<br>INDICTMENT AND CONTINUING<br>STATUS HEARING**<br><br>Re: Dkt. No. 1295 |

Now before the Court for consideration is the motion to dismiss filed by Pangang Group Company, Ltd. ("Pangang Group"), Pangang Group Steel Vanadium & Titanium Company, Ltd. ("PGSVTC"), Pangang Group Titanium Industry, Ltd. ("PGTIC"), and Pangang Group International Economic & Trading Company ("PGIETC") (collectively "Pangang Defendants"). The Court has considered the parties' papers, relevant legal authority, the record in this case, and it has had the benefit of oral argument.  For the reasons that follow, the Court HEREBY DENIES the Pangang Defendants' motion.

## BACKGROUND

The Government alleges the Pangang Defendants violated the Economic Espionage Act ("EEA"), 18 U.S.C. section 1831, based on their alleged efforts to obtain trade secrets belonging to E.I. Dupont de Nemours and Company ("DuPont")'s relating to DuPont's chloride-route titanium dioxide ("TiO2") pigment manufacturing process.  (*See generally* Dkt. No. 971, Third Superseding Indictment ("Third SI").)  The Government alleges the Pangang Defendants are

United States District Court
Northern District of California

United States District Court
Northern District of California

"foreign instrumentalities" under the EEA.  (Third SI ¶¶ 17.c, 56.c; *see also id.* ¶ 2 (alleging individuals conveyed information containing DuPont trade secrets to "companies controlled by the" Government of the People's Republic of China ("PRC")).)

In April 2011, DuPont filed a civil complaint against Walter Liew, U.S.A. Performance Technology, Inc. ("USAPTI"), and John Liu, alleging they misappropriated trade secrets relating to DuPont's TiO2 pigment manufacturing process.  *See E.I. Dupont de Nemours and Company v. U.S.A. Performance Technology, Inc.*, No. 11-cv-1665-JSW.[1]  The Federal Bureau of Investigation subsequently opened a criminal investigation into alleged violations of 18 U.S.C. section 1832.  On August 23, 2011, the Government charged Walter and Christina Liew ("the Liews") with witness tampering and false statements.  (Dkt. No 16, Indictment.)

On February 7, 2012, the Government filed a superseding indictment, in which it charged Walter Liew, USAPTI, the Pangang Defendants, and others, with, *inter alia*, violations of the EEA, including conspiracy to commit economic espionage, in violation of 18 U.S.C. section 1831(a)(5), conspiracy to commit theft of trade secrets, in violation of Section 1832(a)(5), and attempted economic espionage, in violation of Section 1831(a)(3)-(4).  (Dkt. No. 64, Superseding Indictment.)[2]

18 U.S.C. section 1831 provides:

> [w]hoever, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly--
>
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains a trade secret;
>
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys a trade secret;

---

[1]     DuPont never amended its complaint to include the Pangang Defendants as Defendants, and the parties stipulated to dismiss that case on May 29, 2019.

[2]     On March 12, 2013, the Government filed a second superseding indictment, which did not alter the charges against the Pangang Defendants.  (Dkt. No. 269.)

(3) receives, buys, or possesses a trade secret, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempts to commit any offense described in any of paragraphs (1) through (3); or (5) conspires with one or more other persons to commit any offense described in any of paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy

shall, except as provided in subsection (b), be fined not more than $5,000,000 or imprisoned not more than 15 years, or both.

(b) Organizations. -- Any organization that commits any offense described in subsection (a) shall be fined not more than the greater of $10,000,000 or 3 times the value of the stolen trade secret to the organization, including expenses for research and design and other costs of reproducing the trade secret that the organization has thereby avoided.

On March 29, 2012, the Pangang Defendants moved to quash service of the superseding indictment.  The Court granted that motion on July 23, 2012.  *United States v. Pangang Group Co., Ltd.*, 879 F. Supp. 2d 1502 (N.D. Cal. 2012) ("*Pangang I*").  On December 6, 2012, the Government filed a notice that it attempted service on the Pangang Defendants.  On February 7, 2013, the Pangang Defendants moved to quash service.  On April 8, 2013, the Court granted, in part, and denied as moot, in part, that motion.  (Dkt. No. 293 ("*Pangang II*").)  On October 10, 2013, the Court denied the Government's motion for leave to file a motion to issue new summonses, which was based on a theory that it substantially complied with Federal Rule of Criminal Procedure 4 ("Rule 4").  *United States v. Pangang Group Co., Ltd.*, No. 11-cv-573-7-JSW, 2013 WL 12207684 (N.D. Cal. Oct. 10, 2013) ("*Pangang III*").

On January 5, 2016, the Government filed the Third SI and charged the Pangang Defendants with one count of conspiracy to commit economic espionage, in violation of Section 1831(a)(5), and one count of attempted economic espionage, in violation of Section 1831(a)(1)-(4).  The Government alleges that Pangang Group is a state-owned enterprise ("SOE") controlled by the State-Owned Assets Supervision and Administration Commission of the State Council ("SASAC") of the PRC.  (*Id.* ¶ 4.)[3]  SASAC was created in 2003 "to exercise ownership of state-

[3]        "State-owned enterprises … in China are enterprises whose assets are owned by the state."

United States District Court
Northern District of California

owned enterprises on the [PRC's] behalf," which at that time included Pangang Group. (Szamosszegi Decl., ¶¶ 7-8 13, 16, Exs. 6-7.)

The Government also alleges that Pangang Group's Chairman and other senior managers were officials of the Communist Party. According to the Government, Pangang Group controls PGSVTC, "which shared senior management with Pangang Group." (Third SI, ¶¶ 4, 5.a.) Pangang Group allegedly formed PGTIC in 2007 to develop a chloride-route TiO2 factory in Sichuan Province. Pangang Group and PGSVTC allegedly own and control PGTIC and PGIETC, the latter of which was a financing arm of Pangang Group. (*Id.* ¶¶ 5.b-5.c; *see also* Szamosszegi Decl., ¶ 17, Ex. 26.)

On December 19, 2016, Magistrate Judge Corley granted the Government's application to issue summonses to the Pangang Defendants. The Pangang Defendants did not appear for the arraignment, and the Government filed a motion for sanctions. On April 17, 2017, while the motion for sanctions was pending, the Pangang Defendants filed their third motion to quash service and opposed the Government's motion for sanctions. On July 18, 2017, based on recent amendments to Rule 4, the Court denied the Pangang Defendants' motion to quash and deferred ruling on the Government's motion for sanctions. *United States v. Pangang Group Co., Ltd.*, No. 11-cr-573-7-10-JSW, 2017 WL 3034063 (N.D. Cal. July 18, 2017) ("*Pangang IV*"). The Court then granted a stipulation to postpone the arraignment pending the Pangang Defendants' petition for writ of mandamus to the Ninth Circuit. On August 22, 2018, the Ninth Circuit denied the petition. *In re Pangang Group Co., Ltd.*, 901 F.3d 1046 (2018) ("*Pangang V*"). The Pangang Defendants were arraigned, and the Court denied the Government's motion for sanctions as moot.

Following the Pangang Defendants' arraignment on the Third SI, the Government produced discovery, the parties negotiated a protective order, and the parties presented various

---

(Dkt. No. 124, Declaration of Andrew Z. Szamosszegi ("Szamosszegi Decl."), ¶ 3.) The Government submitted the Szamosszegi Declaration with its opposition to the Pangang Defendants' first motion to quash. The Pangang Defendants have relied on that declaration and its exhibits, which are filed at Docket Nos. 125 through 127, in support of this motion. Many of the exhibits to Mr. Szamosszegi's declaration have not been translated, and the Court relies only on cited exhibits that are in English.

United States District Court
Northern District of California

discovery disputes to Magistrate Judge Cousins.  The parties also raised disputes with this Court about the timing of pretrial disclosures, and the Pangang Defendants filed a motion for bill of particulars, which the Court granted in part.  (*See, e.g.,* Dkt. Nos. 1124, 1142.)

On July 9, 2019, the Pangang Defendants moved to dismiss the Third SI and, for first time, argued they were immune from prosecution under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. sections 1330(a) and 1602 through 1611.  On August 26, 2019, the Court denied the motion.  (Dkt. No. 1223, "*Pangang VI*".)  When it ruled on that motion, the Court accepted as true the Government's allegations that the Pangang Defendants were "foreign instrumentalities" for purposes of the EEA.  It also concluded that any differences between the definitions of foreign instrumentalities in the EEA and in the FSIA were not material to resolution of the motion.  (*Id.* at 3:24-5:22, 11:4-8.)  It did not reach the issue of whether the FSIA applied to criminal cases but concluded that if the FSIA applied, so did its exceptions.  The Court then concluded that the FSIA's commercial activity and waiver exceptions applied and, accordingly, denied the motion.  (*Id.* at 10:5-17:10.)

The Pangang Defendants appealed, and the Ninth Circuit affirmed on different grounds. *United States v. Pangang Group Co., Ltd.*, 6 F.4th 946 (9th Cir. 2021) ("*Pangang VII*"). Specifically, the Ninth Circuit concluded that the definition of foreign instrumentality under the EEA was "much broader" than the FSIA's definition of the term.  For that reason, it held "the allegation that the Pangang Companies are 'foreign instrumentalities' under the EEA, without more, is insufficient to trigger applicability of the FSIA." *Id.* at 959-60.  The court also concluded that because the Government alleged that PGSVTC, PGTIC, and PGIETC were subsidiaries of Pangang Group, those allegations "affirmatively *negate[d]* the premise" that those entities were directly owned by the PRC or by SASAC.  *Id.* at 958 (emphasis in original).

The court also looked to the allegations that Pangang Group was "controlled" by SASAC and that it was "state-owned[.]"  It concluded the former allegation was insufficient to establish Pangang Group was a foreign instrumentality for purposes of the FSIA because it did not speak to direct ownership.  It concluded the latter term was too ambiguous to establish direct ownership. *Id.* at 958-59.  The court also took note of the Government's theory that, at least by 2010, SASAC

indirectly controlled Pangang Group, which was supported by Mr. Szamosszegi's declaration.[4]  *Id.* at 959.  It reasoned the Government's position on indirect control "further underscore[d] the already amply-supported conclusion that the indictment's use of the term 'state-owned' was not intended to speak to the corporate-structure issues that are dispositive[.]"  *Id.*

Following remand from the Ninth Circuit, the Court held a status conference.  Although the Court previously established a filing deadline for motions challenging the Third SI, it inquired whether there would be any further motion practice on the applicability of the FSIA.  The Pangang Defendants indicated they were contemplating bringing a further motion to dismiss, and the Court stated that any such motion should be filed "as soon as possible."  (Dkt. No. 1290, Minute Order).  On November 30, 2021, the Pangang Defendants filed their motion to dismiss.

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

The Pangang Defendants argue they have met their burden to make a *prima facie* showing that they are foreign instrumentalities and, as such, are immune from prosecution under the FSIA and under the common law.  *See Pangang VII,* 6 F.4th at 954.  The Pangang Defendants also renew the argument that while the FSIA applies in criminal cases, its exceptions are inapplicable.  The Government argues that the evidence is insufficient to establish that any of the Pangang Defendants are entitled to assert sovereign immunity.  It also renews its argument that the FSIA does not apply in criminal cases but if it does apply, so do the exceptions.  Finally, the Government argues that the common law does not provide the Pangang Defendants protection because it too provides for a commercial activity exception and because, at common law, determinations of sovereign immunity were the prerogative of the Executive Branch.

**A.    Applicable Legal Standards.**

Under the Federal Rules of Criminal Procedure, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue," and

---

[4]    As of October 1, 2019, SASAC does not directly own *any* of the Pangang Defendants. *See, e.g., United States v. Pangang Group Co. Ltd., et al.*, United States Court of Appeals for the Ninth Circuit No. 19-10306, Dkt. No. 9.

United States District Court
Northern District of California

a "motion that the court lacks jurisdiction may be made at any time while the case is pending." Fed. R. Crim. P. 12(b)(1)-(2).[5]  "A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact."  *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986).

The Pangang Defendants now make a factual attack on the Court's jurisdiction and have submitted evidence to support their motion.  Accordingly, the Court has not presumed the allegations in the Third SI are true.  *See Pangang VII*, 6 F.4th at 953 (citing *Terenkian v. Rep. of Iraq*, 694 F.3d 1122, 1134 (9th Cir. 2012)).  "[W]here the material facts are disputed, the trial court may still evaluate the merits of the jurisdictional claims."  *Terenkian*, 694 F.3d at 1134; *see also Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("[I]f the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment and grant the motion to dismiss for lack of jurisdiction only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.").

**B.    The FSIA.**

The Constitution grants federal courts jurisdiction to hear claims involving foreign states. U.S. Const. art. III, § 2, cl. 1.  However, the concept of "[f]oreign sovereign immunity is, and always has been, 'a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution.'"  *Rep. of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 140 (2014) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983)).  Until approximately 1952, "foreign sovereigns enjoyed absolute immunity in U.S. courts," and the judicial branch generally "deferred to the decisions of the political branches – in particular those

---

[5]    Because the Pangang Defendants are contesting the Court's jurisdiction, the Court shall not hold the Pangang Defendants to the deadline it previously established for challenging the Third SI. Subject matter jurisdiction is not an issue that can be waived.  *See Pangang VII*, 6 F.4th at 959. However, the Court will consider whether legal or factual arguments that could have been raised in their first motion provide further support for the Government's arguments about why the Court should conclude the Pangang Defendants have waived sovereign immunity.

United States District Court
Northern District of California

of the Executive Branch – on whether to take jurisdiction over actions against foreign sovereigns and their instrumentalities." *Verlinden*, 461 U.S. at 486.

Beginning in 1952, the State Department began to adopt a "restrictive theory" of foreign sovereign immunity. *Id.* at 486-87.

> Under this theory, immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts. … This change threw immunity determinations into some disarray, because political considerations sometimes led the [State] Department to file suggestions of immunity in cases where immunity would not have been available under the restrictive theory. … Congress responded to the inconsistent application of sovereign immunity by enacting the FSIA in 1976.

*Samantar v. Yousuf*, 560 U.S. 305, 312-13 (2010) (internal quotations and citations omitted); *see also United States v. Turkiye Halk Bankasi*, 16 F.4th 336, 345 (2d Cir. 2021); *In re Grand Jury Subpoena*, 912 F.3d 623, 626 (D.C. Cir. 2019). The purposes of the FSIA are to "endorse and codify the restrictive theory of sovereign immunity" and to transfer resolution of claims of sovereign immunity from the State Department to the courts. *Id.* at 313 (citing 28 U.S.C. § 1602).

Under the FSIA,

> [s]ubject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. § 1604. The FSIA also provides that "district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." *Id.* § 1330(a).

The term "foreign state" includes an "agency or instrumentality of a foreign state." *Id.* § 1603(a). An "agency or instrumentality" of a foreign state is

> any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, *or* a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of

United States District Court
Northern District of California

8

the United States as defined in section 1332(c) and (e) of this title,
nor created under the laws of any third country.

*Id.* § 1603(b) (emphasis added).[6]

In order for a corporation to show it is a foreign instrumentality based on the majority ownership prong of Section 1603(a)(2), it must show "the foreign state *itself* owns a majority of the corporation's shares." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003) (emphasis added); *see also Pangang VII*, 6 F.4th at 956-59. The Ninth Circuit recently held the FSIA "occupies the field of foreign sovereign immunity as applied to *entities* and categorically forecloses extending immunity to any entity that falls outside the FSIA's broad definition of 'foreign state.'" *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 17 F.4th 930, 933 (9th Cir. 2021) (emphasis in original).

**C.     The Pangang Defendants Fail to Make a Prima Facie Showing that they are Foreign Instrumentalities.**

The Court begins its analysis with whether any Pangang Defendant has established a *prima facie* case that it is entitled to invoke sovereign immunity, either under the FSIA or under common law. *See Pangang VII*, 6 F.4th at 953. If they are able to meet that burden, the Government bears the burden to show an exception applies. If the Government meets that burden, the Pangang Defendants must show by a preponderance of the evidence that the exception does not apply. *Id.* at 954.

**1.     FSIA.**

There is no dispute that each Pangang Defendant is able to satisfy the first and third elements of the FSIA's definition of foreign instrumentality. *Id.* at 955. Therefore, the only question the Court must consider is whether any of the defendants can show the majority of "its

---

[6]     In contrast, the EEA defines "foreign instrumentality" as "any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is *substantially owned*, *controlled, sponsored, commanded, managed, or dominated by a foreign government*[.]"  18 U.S.C. § 1839(a) (emphasis added); *see also Pangang VII*, 6 F.4th at 960 ("the EEA's definition is satisfied if the 'corporation' is 'controlled' by" or "'substantially owned' by a foreign government).

shares or other ownership interest is owned by a foreign state or political subdivision thereof" or

that it is "an organ of a foreign state or political subdivision thereof[.]"  28 U.S.C. § 1603(b)(2).

### a.  Ownership Theory.

Pangang Group is the only defendant that relies on the theory that it was directly owned by

SASAC when the Government filed the superseding indictment on February 7, 2012.  *See*

*Pangang VII*, 6 F.4th at 957 (citing *Dole*, 538 U.S. at 478).  Pangang Group contends that SASAC

owned 100% of Pangang Group's shares until January 12, 2014, when Ansteel Group Corporation

Limited ("Ansteel") assumed 100% ownership of Pangang Group.  (Dkt. No, 1295-2, Declaration

of Zi Chun Wang, ¶ 7, Ex. C ("Statement of Equity Change").)[7]  Mr. Szamosszegi, however,

attests that the merger between Pangang Group and Ansteel occurred in 2010 and, at that time,

Pangang Group was indirectly owned by SASAC.  (Szamosszegi Decl., ¶ 20.)

According to the Statement of Equity Change, Ansteel made a capital contribution to

Pangang Group in 2009.  That is consistent with Mr. Szamosszegi's statement that "in 2008, the

SOE Anshan Group ('Angang'), also 100% owned by SASAC, began taking positions in Pangang

Group subsidiaries in preparation for a merger between the two SOEs."  (Szamosszegi Decl., ¶ 18;

*see also id.*, Ex. 27, Excerpts of Angang Steel Company Limited Annual Reports, 2008-2010).

The annual reports show Anshan Iron and Steel Group Complex was wholly owned by Angang

Holding, which was wholly owned by SASAC.  (*Id.*)  They also show that, on July 28, 2010,

SASAC "agreed to the joint restructuring of Angang Holding and Pangang Group (the "Joint

Restructuring").  The Joint Restructuring entails the establishment by SASAC (as the

representative of the State Council) of a new company, Angang Group Company ('Angang

---

[7]      The Government objects to the exhibits attached to Mr. Wang's declaration on the basis
that they are not admissible under Federal Rules of Evidence 902(3), 902(12), 803(3) or 803(8).
When a party raises a factual attack to jurisdiction, that party "must support … jurisdictional
allegations with competent proof under the same evidentiary standard that governs in the summary
judgment context."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (internal quotations
and citations omitted).  The Court OVERRULES the Government's objections.  *See Norse v. City
of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) ("While the evidence presented at the summary
judgment stage does not yet need to be in a form that would be admissible at trial, the proponent
must set out facts that it will be able to prove through admissible evidence.").

United States District Court
Northern District of California

NewCo'), which will wholly own Angang Holding and Pangang Group."  (Szamosszegi Decl., Ex. 27 at ECF pp. 36-38.)

The FSIA requires direct "majority" ownership, *i.e.* more than 50%.  Assuming that Angang did not obtain 100% of Pangang Group's shares until 2014, that does not preclude Angang from obtaining majority ownership prior to that time.  The level of proof needed to establish a *prima facie* showing is not particularly high.  *See, e.g., Data Disc, Inc. v. Systems Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (noting a *prima facie* showing of jurisdictional facts is less than a preponderance of the evidence).  However, taking into consideration Mr. Szamosszegi's attestation that a merger occurred in 2010, the Court concludes the Pangang Group has not made a *prima facie* showing that it was majority owned by SASAC at the time it was indicted.

Accordingly, it DENIES the Pangang Group's motion on this basis.

### 2.    FSIA - Organ Theory.

The Pangang Defendants also argue the allegations in the Third SI and Mr. Szamosszegi's declaration and its exhibits are sufficient to make a *prima facie* showing that they are "organs" of the PRC.  The Government did not directly respond to this argument in its opposition to the motion to dismiss.  In any other situation the Court would treat the argument as conceded. However, given the importance of the issues, the Court independently evaluated the record to determine if the Pangang Defendants made a *prima facie* showing on this theory.

The term organ has been construed "broadly" and can embody a variety of forms including "a state trading corporation, a mining enterprise, … a steel company, …, [or] an export association."  *EIE Guam Corp. v. Long Term Credit Bank of Japan*, 322 F.3d 635, 640 (9th Cir. 2003) (quoting H.R. Rep. No. 94–1487, at 15-16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6614).  To determine if an entity is an "organ" of a foreign state, a court considers "whether the entity engages in a public activity on behalf of the foreign government[.]"  *Id.*  An "entity may be an organ even if it has some autonomy from the foreign government."  *Id.* (internal quotations and citations omitted).

In *EIE Guam*, the parties' underlying dispute centered on a defaulted loan and failed

United States District Court
Northern District of California

efforts to resolve the matter.  Japan's Resolution and Collection Company ("RCC") had been assigned the loan and removed the case to federal court, and the issue was whether RCC was a foreign instrumentality entitled to remove the matter.  322 F.3d at 639.  The court concluded the RCC was an "organ" of the Japanese government, citing to the fact that "the Japanese government created the RCC expressly to perform a public function[:] … to carry out Japanese national policy related to revitalization of the Japanese financial system[,]" including the purchase of non-performing loans.  *Id.* at 640.  The court also noted the RCC was funded by the government and that private companies were not permitted to perform some of its functions, even if they were in the loan collection business.  *Id.*  The party resisting removal argued against a finding of "organ" status, noting the RCC was a private company, its employees were not civil servants, and it primarily engaged in a "commercial concern."  The Ninth Circuit was not persuaded.

> A company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants. … As discussed above, the RCC and the [Deposit Insurance Corporation of Japan] engage in exclusive functions that other loan collection companies may not perform.  As to the commercial nature of the RCC's work, we have held that Congress' statement in the legislative history that a "state trading company" and "an export association" can be "organs" of a foreign state indicates Congress' belief that an entity's involvement in commercial affairs does not automatically render the entity non-governmental. … Finally, the district court's key assertion that the RCC's purpose is to carry out Japanese national policy related to the revitalization of the Japanese financial system is well supported in the record.

*Id.* at 641 (internal quotations and citations omitted).  Accordingly, it found that, "on balance," the relevant factors weighed in favor of a finding that the RCC was an "organ" of Japan.  *Id.*

In *Gates v. Victor Fine Foods*, the Ninth Circuit concluded that a marketing board for hog producers, Alberta Pork, was an organ of the Province of Alberta, Canada.  54 F.3d 1457, 1461 (9th Cir. 1995).  A provincial council approved the establishment of Alberta Pork, and although it did not "exercise day-to-day control" over marketing boards, it played "an active supervisory role."  *Id.* at 1460.  For example, marketing boards such as Alberta Pork could "only act in a manner and on the subjects that the [council] has previously authorized," were required to provide "information and records" that the council desired, and members of marketing boards were "immune from liability for acts performed in good faith carrying out their duties -… - a protection

United States District Court
Northern District of California

normally afforded to governmental actors." *Id.* at 1461.

The Pangang Defendants argue that "a *prima facie* showing of [their] 'organ' status is established by their alleged connection to the SASAC of the PRC." (Mot. at 10:8-9.)  They posit that SASAC controlled Pangang Group and, through Pangang Group, SASAC indirectly controlled PGSVTC, PGTIC, and PGIETC.  This argument oversimplifies the inquiry a court must make into whether an entity engages in a public activity for a foreign state.  Instead, the Court must engage in a "holistic evaluation of the circumstances[.]" *EIE Guam*, 322 F.3d at 640.  Pursuant to that evaluation, the Court considers: "[1] the circumstances surrounding [their] creation, [2] the purpose of [their] activities, [3] [their] independence from the government, [4] the level of government financial support, [5] [their] employment policies, and [6] [their] obligations and privileges under state law." *Id.* (internal quotations and citation omitted).

The allegations contained in the Third SI focus on the Pangang Defendants' allegedly criminal conduct and do not specifically address these factors.  The Government alleges that SASAC supervises and manages SOEs, but PGSVTC, PGTIC, and PGIETC do not argue they are SOE's.  Moreover, the allegations do not suggest that the *PRC* formed PGSVTC, PGTIC, or PGIETC.  (Third SI ¶¶ 5.a-c; *see also* Szamoszegi Decl., ¶ 17.)

The Pangang Defendants' reliance on Mr. Szamosszegi's declaration do not add to the equation as to any defendant other than Pangang Group.  Mr. Szamosszegi focuses primarily on the general level of control that SASAC exercises over SOE's, which includes the appointment of executives and the development of five-year plans.  Mr. Szamosszegi also attests that the government will sometimes provide funding to SOEs.  (*See* Szamoszegi Decl., ¶¶ 6-12, Exs. 7, 9-12.)  Mr. Szamosszegi's declaration and the exhibits on which the Court has relied do not address several of the relevant factors, such as employment practices.  For example, there is nothing to suggest that SASAC directed the Pangang Group to create these subsidiaries or that SASAC provides funding to them.  He does attest that PGSVTC and PGIETC share management, which "is typical of the relationship between SOEs and their subsidiaries and a means by which the [Communist Party] and SASAC control the SOEs and their subsidiaries." (*Id.* ¶ 22.)

The Court concludes the factual record here is not analogous to the factual record in either

United States District Court
Northern District of California

*Gates* or *EIE Guam*.  Therefore, although the term "organ" is construed broadly and although a *prima facie* showing is not a high bar, the Court concludes that the allegations of the Third SI alone or in combination with the information contained in the Szamosszegi Declaration are not sufficient to make that showing for PGSVTC, PGTIC, and PGIETC.  Although it is a closer question with respect to the Pangang Group, the Court also concludes it has not met its burden to make a *prima facie* case that it was an "organ" of the PRC at the time it was indicted.

Accordingly, the Court DENIES the motion to dismiss on this basis as well.

**3.     Common Law.**

The Pangang Defendants rely on the same factual record to support their argument that they can be considered foreign states under the common law as they do to support their argument under the FSIA.  The Court concludes that record is not sufficient to establish that they are entitled to assert sovereign immunity under the common law.  *See, e.g., In re Investigation of World Arrangements with Relation to Prod., Transp., Ref. & Distrib. of Petroleum*, 13 F.R.D. 280, 290 (D.D.C. 1952) (looking to "object and purpose of corporation" to determine entitlement to immunity and finding that corporation was "indistinguishable from the Government of Great Britain"); *Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*, 25 Misc. 2d 299, 301 (N.Y. Sup. Ct. 1960) (noting a corporation may claim immunity "where the corporation functions as a public agency or instrumentality or where evidence of corporate separateness from the government was not strong" but finding corporation not entitled to immunity where conduct giving rise to suit was not sort of "public act" typically giving rise to immunity).

Accordingly, the Court DENIES the motion to dismiss on this basis as well.

**D.     The Court Concludes the FSIA Does Not Apply to Criminal Cases.[8]**

Assuming for the sake of argument that any of the Pangang Defendants have made a *prima facie* showing that they are "foreign instrumentalities" under the FSIA, the Court concludes it can no longer avoid the question of whether the FSIA applies to criminal prosecutions.  Therefore, it

---

[8]     If the FSIA does apply in criminal cases, that would preclude the Pangang Defendants from relying on common law to support their claim of immunity.  *See What'sApp Inc.*, 17 F.4th at 933.

United States District Court
Northern District of California

wades into those "murky waters"[9] by beginning, as it must, with the text of the FSIA.  *See, e.g., United States v. Lopez*, 4 F.4th 706, 720 (9th Cir. 2021).  Under the FSIA, "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state *shall be immune from the jurisdiction of the courts* of the United States and of the States *except as provided* in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604 (emphasis added).  Sections 1604 and 1330(a) of the FSIA "work in tandem: [section] 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and [section] 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (emphasis in original) ("*Amerada Hess*").

The Supreme Court has repeatedly stated that if the FSIA applies, it "is the 'sole basis for obtaining jurisdiction over a foreign state in federal court.'"  *Samantar*, 560 U.S. at 314 (quoting *Amerada Hess*, 488 U.S. at 439); *Amerada Hess*, 488 U.S. at 434 ("[T]he text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts.").  To date, the Supreme Court has not "extended [that] holding to a criminal case."  *Turkiye Halk Bankasi*, 16 F.4th at 347 n. 42.

Section 1604 neither expressly excludes nor expressly includes criminal cases, but it is drafted broadly enough to include them.  "Statutory construction, however, is a holistic endeavor.  A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme - because the same terminology is used elsewhere in a context that makes its meaning clear, … or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law[.]"  *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 371 (1988); *see also United States v. Herrera*, 974 F.3d 1040, 1047 (9th Cir. 2020).

Looking at the FSIA holistically, it contains a "panoply of provisions that are consistent

---

[9]      *Pangang VI* at 10:7; *see also* Megan Q. Liu, Note, *The Scope of Sovereign Criminal Immunity: Instrumentalities Under the Foreign Sovereign Immunities Act*, 60 Colum. J. Transnat'l L. 276, 288 n.67 (2021) (arguing FSIA does not apply to criminal cases and offering framework to address claims of foreign sovereign immunity in criminal cases).

United States District Court
Northern District of California

only with an application to civil cases and not to criminal proceedings[.]" *United States v. Hendron*, 813 F. Supp. 973, 975 (E.D.N.Y. 1993). In *Hendron*, the defendant, a Polish citizen and a director at a corporation wholly owned by the state of Poland, was charged with: conspiracy; importing assault weapons into the United States; importing arms without a license; and transaction of business involving proceeds of unlawful activity. *Id.* at 974. The court denied his motion to dismiss and held the FSIA does not apply in criminal cases. It reasoned that "[o]ther than the broad text of [section] 1604's declaration of immunity, nothing in the text of the Act suggests that it applies to criminal proceedings." *Id.* at 975.

For example, Section 1602 uses the term litigants, which "ordinarily refers to a party in a civil suit and not to the state or federal government as prosecutor of criminal charges." *Id.* at 975. As discussed in *Hendron*, other portions of the FSIA contain terms that are associated with civil litigation, such as "action" and "money damages." *See, e.g.,* 28 U.S.C. §§ 1605(a)(5)-(6), 1605(g) (addressing Attorney General's ability to seek to stay discovery in "actions" filed that are subject to exceptions set forth in 28 U.S.C. sections 1605A and 1605B and referring to motions filed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56)), 1605A(c) (providing for "private right of action" and "money damages"), 1606 (restricting liability for punitive damages but allowing for compensatory and actual damages), 1607 (addressing counterclaims), 1608 (addressing service, time to answer, and default); *see also Hendron*, 813 F. Supp. at 975.

The Pangang Defendants rely on *Amerada Hess* to argue that Section 1330(a) trumps any other statutory jurisdictional provisions when a claim of foreign sovereign immunity is raised. In *Amerada Hess*, the plaintiff filed suit relying on the Alien Tort Statute, 28 U.S.C. section 1350, to assert jurisdiction for an act for which the defendant normally be immune: bombing a ship during the Falklands War. 488 U.S. at 432. The Court concluded that neither the Alien Tort Statute nor other "grants of subject matter jurisdiction in Title 28" provided the district court with jurisdiction over the plaintiff's claims. *See* 488 U.S. at 433-39.

It is a "settled proposition that the subject matter jurisdiction is determined by Congress in the exact degrees and character which to Congress may seem proper for the public good." *Id.* at 433 (internal citations and quotations omitted). Although the FSIA provides for original

United States District Court
Northern District of California

16

United States District Court
Northern District of California

jurisdiction of non-jury actions, Congress also expressly granted district courts "original jurisdiction, exclusive of the courts of the states, of *all* offenses against the laws of the United States."  18 U.S.C. § 3231 (emphasis added).  In *In re Grand Jury Subpoena*, a corporation moved to quash a grand jury subpoena and argued the FSIA "eliminated all criminal subject-matter jurisdiction over foreign sovereigns[.]"  912 F.3d at 628; *see also id.* (noting corporation relied on Section 1330(a) to argue that "the provision … silently and simultaneously revoke[d] jurisdiction over any case not falling within its terms, including any criminal proceeding").

Although the D.C. Circuit did not decide whether the FSIA applied in criminal cases, it aptly noted that "[i]t is hard to imagine a clearer textual grant of subject-matter-jurisdiction" than 18 U.S.C. section 3231.  *Id.*  "'All' means 'all'; the provision contains no carve-out for criminal process served on foreign defendants."  *Id.*; *accord Turkiye Halk Bankasi*, 16 F.4th at 347.[10]  The D.C. Circuit also reasoned that on the facts, the case did not present a situation where exercising jurisdiction would "provide an end run around the [FSIA's] immunity provision," which was one of the *Amerada Hess* court's chief concerns.  912 F.3d at 629.  Instead, it determined that if a criminal case falls within an exception to the FSIA, Section 3231 and the FSIA can "coexist peacefully"  *Id.* at 629-31.

Congress articulated the FSIA's purpose in Section 1602, which provides that foreign states are not "are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned," and that "[c]laims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with" those principles.  In light of that statement of purpose, this Court is not convinced that "Congress … dramatically gutted the government's crime-fighting toolkit" by creating an absolute grant of immunity from criminal prosecution.  *In re Grand Jury Subpoena*, 912 F.3d at 630.

The legislative history of the FSIA also supports the conclusion that it was not intended to

---

[10]    The D.C. Circuit also read *Amerada Hess* to give "no hint at all that [the Supreme Court] intended to create a loophole where, in criminal cases clearly covered by an exception to immunity, a district court would nevertheless lack subject-matter-jurisdiction."  *In re Grand Jury Subpoena*, 912 F.3d at 629; *but see Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 750 F. Supp. 838, 843-44 (N.D. Ohio 1990) (concluding *Amerada Hess* "did not limit its conclusion concerning the FSIA to civil cases").

apply to criminal cases.  Like the text of the statute, the legislative history is replete with terms generally associated with civil cases.  For example, Charles N. Brower, Legal Advisor to the Department of State, and Bruno Ristau, Chief of the Foreign Litigation Unit of the DOJ's Civil Division, testified before a Congressional Subcommittee about a draft version of the FSIA. *Immunities of Foreign States: Hearing Before the Subcommittee on Claims and Governmental Relations of the Committee on the Judiciary*, House of Representatives, Ninety-Third Congress, First Session on H.R. 3493, at 19-20, 23-24, 29, 30-34 (June 7, 1973).  Their testimony includes references to "suits" or parties being sued, "plaintiffs" or "litigants", removal, "actions for damages," "summons and complaint," and the Federal Rules of Civil Procedure.  *Id.* at 19-20, 23-24, 29, 30-34; *see also* H.R. Rep. 94-1487, at 6, 19, reprinted in 1976 U.S.C.C.A.N. 6604, at 6605, 6617-18 (1976) (in discussion of commercial activity referencing claims for unjust enrichment, violations of securities law, and wrongful discharge).

Consistent with the statutory text, the section-by-section analysis in the House Report contains references to terms that are consistent with civil litigation, including references to the Federal Rules of Civil Procedure.  *See, e.g.*, H.R. Rep. 94-1487, at 25-26, 28, 32, 1976 U.S.C.C.A.N. at 6623-24, 6627, 6631.  The *Hendron* court also found support for its conclusion within that legislative history.  813 F. Supp. at 975-76.  Having surveyed the House Report that court concluded it gave "no hint that Congress was concerned that a foreign defendant in a criminal proceeding would invoke the Act to avoid a federal court's jurisdiction." *Hendron*, 813 F. Supp. at 976.  This Court concurs with that assessment, as well as the D.C. Circuit's conclusion that the legislative history does "not say a single word about possible criminal proceedings under the statute" and is focused on "headaches born of private plaintiffs' civil actions against foreign states." *In re Grand Jury Subpoena*, 912 F.3d at 630 (internal quotations and citations omitted).

The Court also has considered the cases cited in its previous order and the issue of the FSIA's applicability to criminal cases anew.  The Court still finds the reasoning in *Hendron* more persuasive than the reasoning of the Courts that have determined the FSIA does apply in criminal

1    cases.[11]   Accordingly, the Court concludes the FSIA does not apply in criminal proceedings, and it

2    DENIES the Pangang Defendants' motion on that basis.

3    **E.     If the FSIA, Its Exceptions Apply as Well.**

4          Assuming for the sake of argument the FSIA does apply to criminal prosecutions, the

5    Court once again concludes that its exceptions would apply as well.[12]   The Pangang Defendant

6    have not convinced the Court that it should revisit its conclusions on the applicability of the

7    commercial activity exception or the waiver exception.   Accordingly, the Court incorporates by

8    reference its previous analysis on those exceptions and finds they would apply.   *Pangang VI* at

9    11:9-17:8.   The Court's conclusion on the commercial activity exception is further supported by

10   the Second Circuit's opinion in *Turkiye Halk Bankasi* rejecting the defendant's argument that its

11   activities were sovereign in nature.   The court found the defendant conflated the purpose of the act

12   with the act itself, and it determined the defendant's "participation in money laundering schemes

13   designed to evade U.S. sanctions" were activities "that could be, and in fact regularly [are],

14   performed by private-sector businesses[.]"   16 F.4th at 350.

15          Accordingly, the Court DENIES the motion to dismiss on this alternative basis.

16   **F.     Common Law.**

17          The Court also considers the Pangang Defendants argument that they are completely

18   immune from prosecution under the common law.[13]   Assuming for the sake of argument that they

19

20   [11]     *See Pangang VI* at 6:2-4, 7:2-8:26 & n.4.   The Ninth Circuit subsequently affirmed the
     district court's decision in *Broidy Capital Management, LLC v. State of Qatar*, on which the

21   Pangang Defendants relied in their first motion, albeit on different grounds.   982 F.3d 582 (9th
     Cir. 2020).   The court held that "a foreign government's deployment of clandestine agents to

22   collect foreign intelligence on its behalf, without more, is the sort of peculiarly sovereign conduct
     that all national governments (including our own) assert the distinctive power to perform."   *Id.* at

23   595.   Therefore, it determined the conduct at issue did not fall within the scope of the commercial
     activity exception.   The Ninth Circuit's opinion in *Broidy* supports this Court's prior conclusion

24   that *Broidy* was distinguishable from the facts of this case because the defendant's activities were
     "devoid of a commercial component."   *Pangang VI* at 15:2-4.

25   [12]     Some of the exceptions do appear more appropriate to civil proceedings, yet Section

26   1605(a) states they apply in "any case" rather than in any "civil action."   *See In re Grand Jury
     Subpoena*, 912 F.3d at 632; *Turkiye Halk Bankasi*, 16 F.4th at 348 n.48 ("Just as 'all' means 'all,'

27   so must 'any' mean 'any.'").

28   [13]     This argument rests on the Court's conclusion that the FSIA does not apply to criminal
     cases.   Assuming the FSIA is not applicable, the Court concludes that the Ninth Circuit's holding

United States District Court
Northern District of California

established they would be entitled to claim foreign sovereign immunity, which the Court concludes they have not, the Court concludes they cannot find shelter in the common law.

The Pangang Defendants argue that under the common law the restrictive theory of sovereign immunity does not apply and absolute immunity remains the rule. *Cf. Gould*, 750 F. Supp. at 844 ("[I]n peacetime situations, this country does not bring criminal proceedings against other nations."); *see also* Hazel Fox & Philippa Webb, *The Law of State Immunity* at 92 & n. 67 (3d ed. 2015) ("legislation in common law countries introducing the restrictive approach of immunity in civil proceedings excludes its application to criminal proceedings"); *Research Handbook on Jurisdiction and Immunities in International Law*: Chapter 7, Elizabeth Helen Franey, *Immunity from the criminal jurisdiction of national courts*, at 205 (2015) ("State immunity from the criminal jurisdiction of foreign states is a matter of customary international law.").[14]

The Court does not find it dispositive that the Department of Justice chose to prosecute this case. However, that decision does factor into its analysis. *See, e.g., United States v. Sinovel Wind Group Co.*, 794 F.3d 787, 792 (7th Cir. 2015) (affirming denial of motion in quash service where PRC held minority ownership interest in defendant and stating "the decision to prosecute a foreign corporation represents the assessment of the Executive Branch, through the Department of Justice, that the proceeding furthers U.S. interests"). The Court also has considered legislative history of the EEA, in which Congress stated the act was intended to cover and punish a "foreign government that uses its classic espionage apparatus to spy on a company, … two American companies that are attempting to uncover each other's bid proposals, or [a] disgruntled former employee who walks out of his former company with a computer diskette full of engineering schematics." H.R. Rep. 104-788 at 5 (1996).

The Second Circuit's analysis of common law immunity in *Turkiye Halk Bankasi* is minimal. 16 F.4th at 350-51. However, the court noted that "customary international law"

---

in *What'sApp* does not resolve this issue.

[14] Excerpts from Fox & Webb are attached as Exhibit 2 Mr. Packard's declaration. The page cited can be found at ECF p. 55. The Franey reference is attached as Exhibit 3 to Mr. Packard's declaration.

United States District Court
Northern District of California

recognizes the restrictive theory of sovereign immunity, which would not protect commercial activity.  *Id.* at 351 n.70 (citing Rest. (Fourth), For. Rel. L. of the U.S. § 454 cmt. h).  Because the Court has determined that the charged conduct is commercial in nature, it concludes the Pangang Defendants are not entitled to immunity under the common law.

Accordingly, the Court DENIES the motion to dismiss on this basis as well.

### CONCLUSION

For the foregoing reasons, the Court DENIES the Pangang Defendants' motion to dismiss. The Court CONTINUES the status hearing set for March 1, 2022, to March 15, 2022, at 12:00 p.m.  The parties shall file a joint status report by March 8, 2022.

IT IS SO ORDERED.

Dated: February 25, 2022

_____
JEFFREY S. WHITE
United States District Judge