UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

PANGANG GROUP COMPANY, LTD.;
PANGANG GROUP STEEL VANADIUM
& TITANIUM COMPANY, LTD.;
PANGANG GROUP TITANIUM
INDUSTRY COMPANY, LTD; and
PANGANG GROUP INTERNATIONAL
ECONOMIC & TRADING COMPANY,

Defendants.

Case No.  11-cr-00573-JSC-7-10

**ORDER RE: GOVERNMENT'S
MOTION TO EXCLUDE EXPERTS**

Re: Dkt. Nos. 1415, 1416

The United States of America ("Government") has indicted Defendants, a Chinese state-owned industrial company and its related subsidiaries, for conspiring and attempting to steal trade secrets related to Titanium Dioxide ("TiO2") production from E.I. DuPont de Nemours & Company ("DuPont") in violation of 18 U.S.C. §§ 1831(a)(4) and 1831(a)(5).  (Dkt. No. 971.)[1] Pending before the Court are the Government's motions to exclude Defendants' experts (1) Terry W. Livingston and (2) Ragesh K. Tangri.  (Dkt. No. 1416.)  Having carefully considered the parties' submissions, and with the benefit of oral argument on June 18, 2026, the Court DENIES the Government's motion.  However, Mr. Livingston may not state opinions which would compel conclusions about Defendants' mental states or conditions, and Mr. Tangri may not opine on ultimate legal conclusions regarding the alleged trade secrets at issue or speculate about DuPont's

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

motives in sending the 2009 letter. But, as discussed at the hearing, depending on how the evidence comes in at trial, the Court may decide Mr. Tangri's testimony is not relevant or helpful to the jury.

## DISCUSSION

Under Federal Rule of Evidence 702, a witness may offer expert testimony if the witness "is qualified as an expert by knowledge, skill, experience, training, or education," and the proponent of the witness demonstrates to the court it is more likely than not:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

These criteria can be distilled to two overarching considerations: "reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see also United States v. Valencia-Lopez*, 971 F.3d 891, 900 n.8 (9th Cir. 2020) ("[T]he district court's gatekeeping function . . . ensures that expert evidence is sufficiently relevant and reliable when it is submitted to the jury." (cleaned up)). As a gatekeeper, the court's "task [] is to analyze not what the experts say, but what basis they have for saying it." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective . . . is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

"[J]udges are entitled to broad discretion when discharging their gatekeeping function," including in "determining whether an expert's testimony is reliable [and] in deciding how to determine the testimony's reliability." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quotation marks and citation omitted). Still, trial courts should "not exclude opinions merely because they are impeachable." *City of Pomona v. SQM N. Am. Corp.*,

United States District Court
Northern District of California

2

750 F.3d 1036, 1044 (9th Cir. 2014) (quotation marks and citation omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Ultimately, "[t]he relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility." *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (quotation marks and citation omitted).

## I.    TERRY W. LIVINGSTON

Mr. Livingston is a "registered Professional Engineer" with degrees in Chemical Engineering and "more than 25 years of experience in chemical plant operations and engineering." (Dkt. No. 1415-1 at 11.) Over his career, he has "developed significant hands-on experience in [TiO2] process technology, particularly in connection with chloride-route production systems." (*Id.* at 12.) For example, Mr. Livingston has:

> (1) "developed multiple process flowsheet designs for TiO2-related applications for TiWest and Kerr-McGee";
>
> (2) "provided on-site engineering support and capital project assistance at the Kerr-McGee facility . . . working directly within an operating TiO2 plant environment";
>
> (3) led "engineering organizations and capital programs" at Evonik Degussa and Kemira, "where [he] evaluated third-party proposals, managed competitive bid processes, and selected consulting engineers and contractors"; and
>
> (4) "led or materially contributed to at least 100 formal proposals and RFP responses for projects in refining, petrochemicals, specialty chemicals, mining chemicals, power, and related process industries."

(*Id.* at 11-12.)

Defendants retained Mr. Livingston to explain to the jury what each alleged trade secret in the Government's Bill of Particulars "generally refers to, how it could be used in [TiO2] chemical plant using the chloride-route process, and why such information may be commercially sensitive in the context of . . . a TiO2 facility." (*Id.* at 13.) Mr. Livingston also plans to explain "how a reasonable chemical engineer would have viewed and understood" the materials in packages allegedly presented to Defendants, specifically whether those materials "would indicate to a chemical engineer with some experience in TiO2 that trade secrets have been misappropriated."

3

United States District Court
Northern District of California

(*Id.*)

As a methodology, Mr. Livingston evaluates each item in the Bill of Particulars based on four criteria "drawn from [his] 25+ years of professional experience in chemical plant design, operations, engineering, and troubleshooting, during which [he] ha[s] routinely evaluated technology proposals and designs." (*Id.* at 14-15.)  These criteria include whether:

> (1) the documents contain source attributions or identifiers linking them to DuPont;
>
> (2) the content includes information more specific than that in publicly available or independently derivable information;
>
> (3) the documents reveal non-obvious integration or optimization choices unlikely to be derived "through standard design methods and publicly available information alone"; and
>
> (4) the scope, depth, format, and detail are "consistent with what legitimate technology companies routinely provide at comparable [project] stages."

(*Id.* at 15.)  For each alleged package, Mr. Livingston ultimately opines—although his language varies slightly—"A chemical engineer with some degree of background in TiO2 production, but without access to DuPont's confidential or proprietary information, would not, based solely on the information presented in those packages, reasonably discern that the materials reflect DuPont trade secrets." (*See, e.g.*, *id.* at 19, 23 27, 31, 35, 38-39, 42, 46, 49.)

The Government moves to exclude Mr. Livingston's expert opinions because (A) he has not shown he is qualified to reliably offer them, and (B) they are unhelpful and risk impermissibly opining on Defendants' mental state.

### A.    Qualifications and Reliability

"Rule 702 contemplates a *broad conception* of expert qualifications."  *Hangarter*, 373 F.3d 998, 1015 (9th Cir. 2004); *see also id.* ("'In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.'" (quoting Fed. R. Evid. 702 advisory committee note)).  Given the "minimal foundation of knowledge, skill, and experience required in order to give 'expert testimony,'" *id.* at 1016 (cleaned up), "[d]isputes as to the strength of an expert's credentials . . . go to the weight, not the admissibility, of his testimony," *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (cleaned up).  Ultimately, "[e]xpert opinion

United States District Court
Northern District of California

testimony . . . is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline," *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quotation marks and citation omitted), and "[a]n expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion," *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

The Government argues Mr. Livingston's description of his experience and methodology do not show he is qualified to offer a reliable expert opinion on "what an average chemical engineer would recognize or not recognize as a flag of misappropriated trade secrets."  (Dkt. No. 1416 at 7.)  At its core, the Government's argument is Mr. Livingston has not shown he can reliably opine what an average person—as opposed to what he himself—would recognize as a trade secret.

The Government challenges specific aspects of Mr. Livingston's experiences and opinions. It first questions how Mr. Livingston worked from 1995 to 1996 as a "Lead Process Engineer for titanium dioxide process upgrade" at Brown & Root, *see* Dkt. No. 1415-1 at 6, when Brown & Root's website does not mention it operates a TiO2 line, *see* Brown & Root, What We Do, https://www.brownandroot.com/what-we-do/ (last visited June 9, 2026).  The Government also contends Mr. Livingston has not shown his experience developing "standard design approaches" at TiWest and Kerr-McGee is relevant to approaches "across the industry" instead of "only his past employer's clients."  (Dkt. No. 1416 at 7.)  In addition, the Government argues Mr. Livingston has not explained why his experience is "the average experience that a chemical engineer with some TiO2 experience obtains," and therefore sufficient to reliably opine on what an average engineer would think.  (*Id.* at 7-8.)  However, none of these are challenges to Mr. Livingston's overall "credentials and qualifications," or his "general methodology."  *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 970.  Instead, the Government challenges specific "aspects of the witness testimony" which "go to the weight of the testimony and its credibility, not its admissibility."  *See id.* (explaining challenges to an expert's choice of comparator, baseline market, and extrapolation were "three aspects of the witnesses testimony" which did not prevent admissibility).

United States District Court
Northern District of California

Ultimately, Mr. Livingston's report explains he has worked for many industrial clients, has led or contributed to "at least 100 formal proposals and RFP responses" for projects of varying sizes, and has "directly executed or supervised hundreds of consulting assignments and engineering studies," all of which form a foundation from which he can broadly opine on the industry and its participants. (Dkt. No. 1415-1 at 11-12.) His report also details the foundation of his knowledge of "standard, widely understood engineering practice in TiO2 production, as well as the types of modifications, optimizations, and equipment configurations that are routinely encountered in the industry." (*Id.* at 13.) And, the Government does not dispute Mr. Livingston's more than 25 years of experience provides him with specialized knowledge of chemical engineering or TiO2 processes. So, Mr. Livingston's knowledge of and experience within the TiO2 industry "lays at least the minimal foundation of knowledge, skill, and experience required in order to give expert testimony on the practices and norms of" a reasonable chemical engineer with some background in TiO2 production. *See Hangarter*, 373 F.3d at 316 (cleaned up); *see also id.* at 315-16 (holding 25 years' experience working for insurance industry companies and as a consultant to evaluate insurance claims qualified an individual to testify "on the practices and norms of insurance companies in the context of a bad faith claim").

The Government also attacks Mr. Livingston's methodology because he develops his "red flag" criteria based on his own experience rather than through interactions and discussions with other chemical engineers. But the Government cites no case supporting the proposition an expert must conduct surveys or interviews to develop opinions on an industry in which he has decades of experience. To the contrary, courts have consistently considered sufficient methodologies derived from an expert's experience. *See Primiano*, 598 F.3d at 563-67 (reversing a district court's exclusion of doctor who testified based on his experience without citing an "objective source"); *see also Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 580 (N.D. Cal. 2020) (rejecting argument an expert's opinions "must be excluded because he did not conduct any focus group or other consumer testing" given "in-depth experience in this field"). Given Mr. Livingston's experience in the TiO2 industry, the Government's disagreement with his adopted criteria go to the weight of his testimony, rather than its admissibility.

6

Because the Government's criticisms of Mr. Livingston's opinions regarding what an "average" engineer would recognize as a trade secret go to weight rather than admissibility, the Government may cross-examine Mr. Livingston about his work experience, his criteria, and the extent to which his opinions reflect a reasonable person's view at trial.

### B.      Relevance and Improper Opinion on Defendants' Mental State

In criminal cases, expert testimony must also comply with Federal Rule of Evidence 704(b), which provides:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

Fed. R. Evid. 704(b).  Rule 704(b) prevents an expert from stat[ing] an opinion or draw[ing] an inference which would necessarily compel the conclusion" the defendant lacked the requisite mental state.  *See United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997) (en banc).

The Government argues Mr. Livingston's opinion "about what a chemical engineer with some TiO2 background but no inside DuPont knowledge [would think] is far disconnected from what a China-based chemical engineer tasked with reviewing plans for a new 100k TiO2 plant" would think.  (Dkt. No. 1416 at 8.)  According to the Government, "[g]iven this minimal relevance," Mr. Livingston's "testimony poses a substantial risk of confusing the jury and veering into [impermissible] expert testimony on [] Defendants' mental state."  (*Id.*)  To the extent the Government argues Mr. Livingston's opinions are irrelevant or violate Federal Rule of Evidence 403, such an argument is unpersuasive.  Because "a key element of the charged offenses is whether the Pangang Defendants believed that the USAPTI materials improperly contained trade secrets," and Defendants plan to introduce evidence Defendants "had some prior knowledge of TiO2 technology" but no insider DuPont knowledge, Mr. Livingston's opinion how a chemical engineer with some TiO2 background and no insider DuPont knowledge would view the documents is relevant.  (Dkt. No. 1422 at 12-13.)  To the extent the Government believes Mr. Livingston's hypothetical chemical engineer is distinguishable from engineers in Defendants' position, it can raise those distinctions at trial.  *See City of Pomona*, 750 F.3d at 1049 ("Shaky

United States District Court
Northern District of California

[conclusions] should be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." (cleaned up)).

Furthermore, Rule 704(b) does not prohibit Mr. Livingston's opinions as to reasonable conclusions a chemical engineer with some TiO2 background and no inside DuPont knowledge might draw.  Rule 704(b) only prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite *mens rea*," and not "an expert's opinion on any matter from which the factfinder might infer a defendant's mental state." *Morales*, 108 F.3d at 1037.  So, in *United States v. Morales*, 108 F.3d 1031 (9th Cir. 1997), the Ninth Circuit held an expert's testimony on the defendant's "weak grasp of bookkeeping principles" would not violate Rule 704(b) because even if the jury believed the expert, "the jury would still have had to draw its own inference from that predicate testimony to answer the ultimate factual question—whether [the defendant] willfully made false entries," and the jury could find the defendant "had a weak grasp of bookkeeping principles and still knowingly made false entries as charged." *Id.* at 1037.  Like in *Morales*, Mr. Livingston's opinion on a hypothetical chemical engineer's reasonable conclusions does not compel any conclusion about Defendants' conclusions or mental states.  Instead, the jury must draw its own inference to decide whether Defendants had knowledge.  And the Government's arguments Mr. Livingston's opinions are "far disconnected from what a China-based engineer tasked with reviewing plans for a new 100k TiO2 plant" would think, (Dkt. No. 1416 at 8), support the conclusion a jury could credit Mr. Livingston's testimony while finding Defendants possessed or did not possess the requisite *mens rea*.  So, Rule 704(b) does not prohibit Mr. Livingston's testimony.

The Government's attack on Mr. Livingston's evaluation of Pangang's request for proposal and USPTI's response documents is also unavailing.  Mr. Livingston opines: (1) a document's "tone and structure . . . are consistent with a typical industrial request for technology proposals for a new chemical plant," (2) it "appears to request proposals for established process technology rather than seeking confidential information belonging to a specific producer," (3) its "structure reflects a standard technology licensing or engineering services proposal," and (4) its statements "would not suggest to the potential Buyer that the Seller believed the information

8

belonged to another company." (Dkt. No. 1415-1 at 133-134.)  Contrary to the Government's assertion, these statements are not "speculat[ion] regarding what Pangang intended when it drafted or transmitted particular documents." (Dkt. No. 1416 at 9.)  Rather than opinions on Defendants' intent, these statements are Mr. Livingston's interpretations of the documents themselves, drawn from his experience reviewing similar types of documents.  *Cf. United States v. Anchrum*, 590 F.3d 795, 804-05 (9th Cir. 2009) (holding an expert's explanation of "the various reasons a hypothetical drug dealer would posses a firearm" is "a discussion of the modus operandi of the drug dealers that [the expert] had encountered in his experience," and not the defendant's "mental state").  A jury could certainly credit Mr. Livingston's interpretation of the documents while finding Defendants knew or did not know trade secrets were at issue.

The Court therefore denies the Government's motion to exclude Mr. Livingston's expert testimony.

## II.    RAGESH K. TANGRI

Mr. Tangri is a "licensed attorney" and an "expert in intellectual property law," with "33 years of practice . . . including patent litigation and trade secret disputes." (Dkt. No. 1416-2 at 2.) Defendants have retained Mr. Tangri first to explain what patents are and the differences between patents and trade secrets. (*Id.* at 2, 10-12 (prepared explanation).)  Mr. Tangri also intends to testify a 2009 letter from DuPont Legal to USA Performance Technology, Inc. ("USAPTI") is consistent with patent rights correspondence, rather than trade secrets correspondence, (*id.* at 3, 14), and to opine the statement "[i]f you can keep it as a secret, [a trade secret] is forever" is incorrect because independent development can defeat trade secret status, (*id.* at 3, 19).  According to Defendants, Mr. Tangri's expert testimony will help the jury distinguish between patents and trade secrets and therefore "determine whether [] Defendants knew the information they received were trade secrets (the theft of which can be a crime) as opposed to being protected by other forms of intellectual property such as patents (the infringement of which is not a crime)." (Dkt. No. 1422 at 5.)  The Government moves to exclude all Mr. Tangri's testimony because it "either invades the province of the Court or would not be helpful to the jury." (Dkt. No. 1416 at 10 (cleaned up).)

United States District Court
Northern District of California

### A.    Summary of Patents and Differences Between Patents and Trade Secrets

Although "Federal Rule of Evidence 702(a) requires that expert testimony 'help the trier of fact to understand the evidence or to determine a fact in issue[,]' Federal Rule of Evidence 704(a) clarifies that '[a]n opinion is not objectionable just because it embraces an ultimate issue.'" *United States v. Diaz*, 876 F.3d 1194, 1196 (9th Cir. 2017) (quoting Fed. R. Evid. 702(a), 704(a)) (explaining Rule 704(a) "abrogates the old common law doctrine that proscribed testimony going to an ultimate issue" (quotation marks and citation omitted)).  However, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Id.* at 1197 (quotation marks and citation omitted).

The Government first moves to exclude Mr. Tangri's testimony explaining what a patent is, how one is obtained, and the differences between patents and trade secrets as an opinion on a legal conclusion.  However, *United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017), clarifies what is an ultimate legal conclusion; specifically, "[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* at 1197.  And although Mr. Tangri's opinions rely in large part on the Model Patent Jury Instructions, nothing in Mr. Tangri's proposed statement addresses the alleged trade secrets the jury will need to evaluate.  So, his statement does not tell the jury what result to reach for any issue in the case.  Ultimately, Mr. Tangri's statement provides relevant context on a specialized legal framework and procedures which jurors might not otherwise understand.  *See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 946 (N.D. Cal. 2015) (allowing an expert to testify to the policies, practices, and procedures of the Patent and Trademark Office because those procedures are foreign to the average person).

The Government's reliance on *United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993), is unavailing.  *See id.* at 1287 ("It is well settled [] that the judge instructs the jury in the law.").  *Weitzenhoff* did not hold the district court's admission of expert testimony constituted error.  Instead, the Ninth Circuit held the district court erred by "admi[tting] expert testimony on contested issues of law *in lieu of instructing the jury*." *Id.* (emphasis added); *see also id.* ("Although the testimony of the witnesses regarding technical terms in the permit might have been

10

United States District Court
Northern District of California

permissible had the judge proceeded properly to instruct the jury . . . in this case it compounded the error of consigning the interpretation of the law to the jury." (citing Fed. R. Evid. 702, 704)). So, *Weitzenhoff* supports Defendants' argument jury instructions on the legal distinctions between patents and trade secrets may be necessary, rather than the Government's argument Mr. Tangri's testimony should be excluded.

So, Mr. Tangri's statement on patents is not inadmissible as an opinion on an ultimate legal conclusion.

### B. Opinions Regarding DuPont Letter and Testimony in *United States v. Liew*

"Relevance means that the evidence will assist the trier of fact to understand or determine a fact in issue," in other words, "whether it is helpful to the jury." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (cleaned up). So, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection the pertinent inquiry." *Primiano*, 598 F.3d at 565 (9th Cir. 2010) (quotation marks and citation omitted).

First, Mr. Tangri plans to testify a 2009 letter from DuPont Legal to USA Performance Technology, Inc. ("USAPTI") is consistent with patent rights correspondence, rather than trade secrets correspondence. (Dkt. No. 1416-2 at 3, 14 (letter).) The Government moves to exclude this opinion as unhelpful and because "the only potential purpose of the testimony appears to be to allow Tangri to speculate regarding DuPont's motive in sending the letter." (Dkt. No. 1416 at 13.) But according to Defendants, Mr. Tangri plans to, based on his experience in intellectual property litigation, opine on how the letter relates to standard practices in patent litigation. *See King v. GEICO Indemnity Co.*, 712 F. App'x 649, 651 (9th Cir. 2017) (noting "experts may testify about industry standards" and affirming admission of expert testimony about the defendant's "handling of the [insurance] claim in relation to industry standards" (citing *Hangarter*, 373 F.3d at 1010, 1016-17)). So, contrary to the Government's assertion, Mr. Tangri's testimony provides the jury with evidence helpful to understand what the letter discusses. And his opinion the letter is consistent with industry standard practices for patent rights correspondence does not constitute speculation about DuPont's motives in sending the letter. Instead, based on Mr. Tangri's opinion, jurors can draw their own inferences about what DuPont intended to communicate or accomplish.

11

So, the Court will not exclude Mr. Tangri's opinion, except that Mr. Tangri may not speculate about DuPont's motives in sending this letter.

Second, because at the *United States v. Liew* trial, a government witness testified "[i]f you can keep it as a secret, [a trade secret] is forever," Mr. Tangri is prepared to opine the statement is incorrect because independent development can defeat trade secret status. (Dkt. No. 1416-2 at 3, 19 (transcript).)  The Government seeks to exclude this opinion because "it is not likely to be helpful to the jury" given "[t]he government doubts this was actually unclear at the last trial and does not expect this issue to be unclear at [this] trial." (Dkt. No. 1416 at 12 n.3.)  But Defendants argue to the extent a government witness "misstates or overstates the durability of trade secret protection, the defense must be permitted to correct that testimony." (Dkt. No. 1422 at 20.)  And as the jury must evaluate whether the information at issue constituted trade secrets and whether Defendants believed it was a trade secret, this testimony could help a jury understand and determine a fact in issue.  So, although Defendants can also respond to a government witness's incorrect testimony through cross-examination, the Court will not exclude Mr. Tangri's opinion on the ground it is unlikely to help the jury.  Ultimately, however, this particular testimony is likely to be unnecessary.

So, the Court denies the Government's motion to exclude Mr. Tangri's opinion, except that he may not provide opinions on ultimate legal conclusions or speculate about DuPont's motives in sending the 2009 letter.

## CONCLUSION

For the above reasons, the Court DENIES the government's motions.  But, as discussed a the June 18 pretrial conference, depending on how the evidence comes in at trial, the Court may decide that Mr. Tangri's testimony, or at least some of it, is not relevant or helpful to the jury.  The Court also GRANTS the Government's motion to seal Mr. Livingston's expert report because it describes and analyzes information allegedly containing DuPont's "highly sensitive trade secret information." (Dkt. No. 1415 at 2.)  *See* N.D. Cal. Crim. L.R. 56-1.

This Order disposes of Docket Nos. 1415 and 1416.

\\

**IT IS SO ORDERED.**

Dated: June 24, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge